[No. G018314. Fourth Dist., Div. Three. Nov. 17, 1998.]

ROBERT SHERMAN et al., Plaintiffs and Appellants, v.
KINETIC CONCEPTS, INC., Defendant and Respondent.

## COUNSEL

David G. Geffen for Plaintiffs and Appellants.

Murtaugh, Miller, Meyer & Nelson, Richard E. Meyer, Susan Westover and Richard P. Hidalgo for Defendant and Respondent.

## OPINION

**SONENSHINE, J.**—Robert and Janice Sherman appeal from a judgment following a jury trial of their product liability/negligence action against Kinetic Concepts, Inc. (KCI). Sherman contends the court should have granted a new trial and imposed sanctions against KCI for litigation improprieties, including its failure to disclose certain evidence during discovery.

We agree. As we will explain, throughout the litigation, KCI failed to produce and concealed the existence of crucial documents relating to material issues in the Shermans' lawsuit. Compounding that inexcusable dereliction of its discovery obligations, at trial KCI created the false impression its product rarely malfunctioned and then with only transient, inconsequential effects on the consumer. In truth, the dozens of undisclosed incident reports told a far different story about both the frequency and gravity of the problem. To the Shermans' prejudice, the jury never had a chance to evaluate liability against the backdrop of the big picture.

Fortuitously learning of the evidence just after the verdict, the Shermans moved for a new trial. The court denied them relief. It further concluded it was without jurisdiction to award them sanctions under the discovery statute at such a late date.

The court erred on both counts. With regard to a new trial, relief was mandated on the basis of newly discovered evidence and irregularity in the proceedings depriving the Shermans of a fair hearing. The documents and related information KCI withheld were material to design defect and negligence, strengthened the plaintiffs' case and diluted or even impeached KCI's evidence.

As for discovery sanctions, the court had not only the power, but the duty to sanction KCI, in a monetary amount *at least* sufficient to cover all the

costs incurred by the Shermans, including attorney fees, in going through a trial which must now be redone. Because KCI's conduct subverted justice, this was the sanction necessary "to prevent abuse of the discovery process and correct the problem presented [citations]." (*McGinty* v. *Superior Court* (1994) 26 Cal.App.4th 204, 210 [31 Cal.Rptr.2d 292].)

We publish our opinion not only because this is a case of first impression, but because we wish to send a loud and clear message to litigants and counsel alike: We will not tolerate the disgraceful tactics which hallmark the defense in this action. We intend to ensure that any victory achieved by such methods and challenged in this court will be short-lived and costly.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 5, 1993, Robert Sherman (Sherman), a quadriplegic, was admitted to a hospital for postsurgical treatment of a decubitis ulcer on his left buttock. His physician ordered a special therapeutic bed for Sherman. The hospital provided him with a Fluid Air bed supplied by KCI. The frame of the unit holds a basin or tray filled with sand-grain size silicon glass beads coated with an antibacterial agent. The beads are contained within a filter sheet. On top of that, there is a Gore-Tex cover. Forced air constantly circulates the beads, causing them to flow like liquid beneath the filter sheet. The forced air also billows the Gore-Tex cover, creating a cushioned surface which eliminates pressure points.

A few nights before the subject incident, the attending nurse entered Sherman's room on a routine check. She lost her footing. Turning on the light to inspect the floor, she awakened both Sherman and his roommate, Greg Ojala. She discovered bead particles which apparently had escaped from a leak in Ojala's filter sheet. Ojala suffered temporary eye irritation which with treatment cleared up in a few days.

Sometime during the night of March 9, Sherman awoke to find his Gore-Tex cover partially dislodged and a volcano of white dust spraying into his eyes, face and mouth. His filter sheet had been punctured; the circulating air was forcing a stream of beads into the atmosphere. Sherman rang for the nurse, who turned off the air, got him a different bed and moved him to another room. He complained of burning in his throat and lungs. Within hours, a pulmonary physician examined him, performed a number of tests, obtained blood gases and a chest X-ray and concluded there was no problem. Sherman was told his symptoms would resolve within a week or two. His nursing charts reflected no further complaints after five or six days, and by the time of his discharge a few weeks later, he still had no complaints. But

when he returned home, his symptoms recurred, and over the next year, new ones developed.

On March 7, 1994, the Shermans filed their lawsuit against KCI and the hospital,[1] alleging strict liability and negligence. Sherman claimed his inhalation of the Fluid Air bed's beads caused certain immunological complications, manifested by headaches, bowel and bladder problems, swollen feet, insomnia, nausea, sinus leakage, sore throat and ringing ears. His wife, Janice, sought damages for loss of consortium.

During the discovery phase of the litigation, the Shermans requested KCI to identify and produce "[a]ll documents containing information on complaints by any customer, patient, hospital, or other individual or entity relating to the glass beads used in the Fluid Air bed from 1980 to the present." KCI's response advised the Shermans, "After a reasonable inquiry and diligent search, the only documents found and herewith produced are product incident/complaint report[s]" concerning two occurrences in 1991 and a third in 1992, and a notice of a claim relating to one of those reports. The response was signed by KCI's defense attorney and verified by corporate counsel. KCI also submitted a verified denial of the facts of the Shermans' request for admission that "[a]t least five incidents of the filter sheets leaking silicon beads in patients' rooms had occurred in the two-year period preceding the [subject] incident on March 9, 1993."

The Shermans took the deposition of KCI's director of regulatory affairs, William Quirk. At the time, the identified incident reports had not yet been produced. Quirk denied prior knowledge that silicon beads could cause breathing irritation. He could not recall any incidents of leakage except Sherman's. He was unaware of studies regarding respiratory problems associated with inhalation of the glass beads used by KCI. He acknowledged particles can escape through a torn filter sheet, but could not recall ever seeing a filter sheet with a rip or tear that allowed leakage.

In opening statement at trial, KCI's attorney told the jury, "Of the many, many [Fluid Air] beds that have been placed, we have three or four incidents of anybody complaining about the beds." During trial, the Shermans' counsel confronted Quirk with the only three incident reports which had been produced. Two of those listed Quirk as the contact person. Counsel challenged Quirk about his failure at deposition to recall the incidents. Quirk, explaining his lapse of memory, stated, "I was supposed to be testifying on certain things, and I had not reviewed any of the old stuff in our files. The only incident that I could recall at the time was Mr. Sherman's."

---

[1]The hospital defendant also obtained a defense verdict, but the appeal involves only KCI.

Quirk admitted beads leak, but testified such incidents were "not normal." He claimed he knew of silicon bead inhalation causing irritation only from having read manufacturer safety data sheets (MSDS) or hearing secondhand comments in KCI's medical department.

Dr. Wayne Schroeder, an employee of KCI's medical department for nine years and its medical director for five years, testified he would have been informed of all incidents concerning injuries caused by the beads. He was aware of complaints occurring possibly twice per year. When asked why, if there were as many as ten incidents in the past five years, only four reports had been produced, including the one relating to Sherman, Schroeder responded, "The legal department gets the incident reports. [They do] not cross my desk unless [the legal department] ask[s] me to look at . . . or review [them]." Schroeder claimed not to have heard of any incident reports indicating any type of serious illness or injury of any nature caused by the beads.

Other witnesses testified to their awareness of problems related to the beads leaking. One stated knowledge of about a dozen incidents in an 18-month period; another was aware of 4 leakage episodes in as many years.

In closing argument, KCI's counsel acknowledged beads leak from the Fluid Air beds on rare occasions, but added there were no more than "a couple three incident reports." In regard to the unaccounted-for reports alluded to by Schroeder, he denied anything had been withheld from the Shermans, stating, "We had nothing else to give [counsel]. . . . There was nothing to give Mr. Sherman."

The Shermans' attorney reiterated his theories of design defect, to wit, filter sheets, vulnerable to rips, tears and punctures, cause release of harmful materials into the atmosphere, and Gore-Tex covers cannot be attached with sufficient security to protect the patient from exposure to and inhalation of the beads. He further argued KCI's liability based on its failure to warn consumers of the known risk of harm from exposure to the respirable beads and to advise them about precautions to be taken. Finally, he argued KCI had failed to disclose at least six incident reports, from which the jury could infer "[the incidents] were serious, and . . . KCI withheld information from you, the jury."

The trial lasted five weeks. It took the jury only 45 minutes to return its unanimous defense verdict. On the special verdict form, it answered, "No," to two questions: "Was there a defect in design and/or a failure to warn?" "Was any defendant negligent?"

The Shermans moved for a new trial on the grounds of irregularity in the proceedings and newly discovered evidence.[2] They claimed that one week after the verdict, they learned for the first time KCI had falsely answered discovery inquiries and "intentionally failed to disclose highly relevant and material information and documents directly bearing on the fundamental issues of this action." They asked the court to enter a default judgment as a sanction for KCI's alleged misuse of discovery. (Code Civ. Proc., § 2023.)[3]

Specifically, the Shermans said they had been contacted by Gregory Sandefur, a Texas attorney for Gussie Sampson, the plaintiff in a federal district court personal injury action against KCI. According to Sandefur, Sampson suffered a severe knee injury when, during a visit to a hospitalized friend, she slipped on silicon dust from a KCI Fluid Air bed. KCI's preliminary discovery responses to Sandefur's request for copies of all incident reports had disclosed only four or five documents. Later, Sandefur took Quirk's deposition and learned KCI had failed to produce a number of incident reports. His successful motion to compel resulted in production of two dozen such reports, one of which related to Sherman's incident. Sandefur contacted the Shermans and provided them with copies of the 24 incident reports.

In their motion for new trial, the Shermans contended the newly discovered evidence was directly requested in discovery, but KCI had denied its existence. They also argued KCI misled the jury into believing mishaps were infrequent, when in fact the concealed incident reports showed leaks in the Fluid Air beds were a "plaguing problem . . . causing continuing injuries of all types to patients, visitors, nurses, and even an occasional doctor."

In its opposition, KCI asserted it had responded appropriately to discovery inquiries, producing the only incident reports it deemed relevant at the time of the request. It asserted the Shermans had expressed no interest in incidents involving slip-and-fall accidents, which were the subject of about 10 of the reports. And it claimed it had withheld information in the good faith belief the incident reports were inadmissible for one reason or another.

KCI additionally argued even if it ought to have produced the documents, the nonproduction was immaterial because the Shermans presented lots of evidence of bead leakage, including instances involving eye and lung irritation and coughing. The introduction of a few more incident reports would

---

[2]The notice of intention to move for new trial also stated the ground of accident or surprise. However, the Shermans subsequently abandoned this ground by failing to address it in the motion papers.

[3]All further statutory references are to the Code of Civil Procedure unless otherwise stated.

have been cumulative and unlikely to make any difference in the outcome. Moreover, the slip-and-fall reports were irrelevant to the Shermans' theory of risk of harm—inhalation of the beads. Still other reports concerned postaccident incidents which, according to KCI, could not have been admitted to prove any liability theory.

The trial court accepted KCI's no-harm, no-foul argument. Denying the Shermans' motion for new trial, it stated, "This court would have [granted a new trial], if the court felt that the evidence would have changed the verdict. . . . [¶] . . . [¶] [But] [t]he thing I think you have to realize, [counsel], the jury was out only 45 minutes. It didn't take them long to determine that there was no liability in this case. [¶] Had I been the attorney for KCI, I would have produced these documents just to show there were no injuries. . . . It was better evidence [for the defense], in my opinion, . . . than it was for [the plaintiffs]. [¶] Of the 10 incidents before [Sherman's incident] . . . six of them are slip and falls, and the other four had escaped beads with no injuries. [¶] And so assuming that they were relevant and admissible, they would not have changed the verdict." It added, "[A] 45-minute verdict should be some indication that you didn't prove the liability you thought you had proven. And this evidence, in my opinion, could reduce that verdict to 30 minutes because it does not help you. As I see it, it's helpful for KCI. [¶] That's my ruling. The motion is denied. I stated my reasons."

The court also found it could not impose sanctions under section 2023 for discovery violations "after the case is over with." Finally, it declined to impose sanctions under section 128.5, finding the Shermans' request untimely.

## DISCUSSION

■ The standard for review of denial of a new trial motion is stated by our Supreme Court in *City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 871-872 [135 Cal.Rptr. 647, 558 P.2d 545]: "[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal. [Citations.] However, we are also mindful of the rule that on an appeal from the judgment it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party [citation], including an order denying a new trial. In our review of such order *denying* a new trial, as distinguished from an order *granting* a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was

prejudicial." (Original italics.) Prejudice is required: "[T]he trial court is bound by the rule of California Constitution, article VI, section 13, that prejudicial error is the basis for a new trial, and there is no discretion to grant a new trial for harmless error." (*Osborne* v. *Cal-Am Financial Corp.* (1978) 80 Cal.App.3d 259, 265-266 [145 Cal.Rptr. 584].)

I

The Shermans moved for a new trial on the ground of newly discovered evidence. ■ Section 657, subdivision 4 authorizes the court to grant the motion where the moving party has discovered new, material evidence which could not, with reasonable diligence, have been discovered and produced at trial. "The essential elements which must be established are (1) . . . the evidence is newly discovered; (2) . . . reasonable diligence has been exercised in its discovery and production; and (3) . . . the evidence is material to the movant's case." (*Schultz* v. *Mathias* (1970) 3 Cal.App.3d 904, 909-910 [83 Cal.Rptr. 888].)

KCI concedes the first two elements. The only remaining issue is whether the incident reports were material. "Material" in this context means " 'likely to produce a different result.' [Citation.]" (*In re Marriage of Smyklo* (1986) 180 Cal.App.3d 1095, 1101 [226 Cal.Rptr. 174].) Here, the court decided the additional evidence was not material. It erred.

The jury knew directly about only three incidents, excluding Sherman's. The jury did not know there were *at least eight times that many incident reports!* The sheer number of documents is itself of ponderable significance, and may explain KCI's great efforts to conceal this evidence.[4]

The evidence is not "merely cumulative," as KCI argues. (See, e.g., *Schultz* v. *Mathias, supra,* 3 Cal.App.3d at p. 910.) Rather, it goes to the very essence of all of the Shermans' claims. Had KCI produced the reports, the Shermans could have used them to prove: malfunction was commonplace, not rare; the product failed to perform as safely as an ordinary consumer would expect when using it in the intended or reasonably foreseeable manner (BAJI No. 9.00.5); the product involved a substantial, rather than a casual, danger of which the manufacturer failed to warn (BAJI No. 9.00.7); and KCI had to have known of the continuing nature of the problem, but negligently failed to take any action to protect helpless patients like Sherman. The list is

---

[4]The Shermans claim KCI has never produced *any* reports or documents for the years 1988 through 1991, implying evidence for that period may also have been concealed. We have no way of knowing, but we are confident that if there have been omissions which have not yet come to light, KCI will rectify them on remand or the trial court will fashion additional sanctions as appropriate.

by way of example, not all-inclusive. As the Shermans aptly argue, the nonproduction prevented them not only from obtaining the information contained in the reports, but from following up. For instance, if the Shermans' investigator had been able to talk directly to the subject of each incident report, he or she might have heard a far different version from the one prepared by KCI for its own archival purposes.

KCI's concealment of the subject documents deprived the Shermans of the chance to tell the jury the whole story. The trial court erred in determining the evidence would have made no difference or the factfinder would have interpreted it in favor of KCI. The Shermans were entitled to a new trial on the ground of newly discovered evidence.[5]

## II

█ The Shermans contend the court erred in failing to impose sanctions against KCI. We agree. As we explain, as a threshhold matter KCI's continuing disregard of its discovery obligations, as well as its witnesses' utter lack of candor, if not outright lies, at trial, clearly entitled the Shermans to sanctions. KCI *and*, we learned at oral argument, its *trial counsel*, intentionally concealed material information from the Shermans, the trial court and the jury regarding a multitude of prior incidents similar to the subject incident. Through its deception in discovery and in the testimony of its corporate witnesses at trial, KCI held up a grossly distorted picture which the Shermans were powerless to bring into true focus. It intentionally concealed two dozen (and perhaps more—see fn. 4, *ante*) incidents of escaping silicon beads significantly bearing on the Shermans' issues of prior notice, foreseeability, control and failure to warn. It deprived the Shermans of the opportunity to develop their case by contacting other parties with firsthand knowledge of the incidents.

KCI, not the least bit abashed even on appeal, *admits* it had the evidence all the time and withheld it throughout the proceedings because, in *its* opinion, the reports were irrelevant or cumulative or potentially privileged or otherwise inadmissible. How dare KCI and its attorneys play judge and jury in the trial court and then come before this court and argue the propriety of that utterly indefensible conduct! We are appalled that but for a fluke phone call from a Texas attorney, the Shermans would have remained forever unaware they had been cheated out of a fair trial.

We turn to the appropriateness of sanctions. Section 2023 allows the court to impose sanctions for various misuses of the discovery process. (§ 2023,

---

[5]In light of the above discussion, it should be clear the Shermans were also entitled to a new trial on the ground of irregularity in the proceedings preventing them from obtaining a fair trial. (§ 657, subd. 1.)

subd. (a)(1)-(9).) Under section 2023, subdivision (b)(1)-(4), depending on the circumstances, the court may utilize monetary, issue, evidence or terminating sanctions. Neither the code nor any case law mandates that discovery sanctions must be imposed prior to the rendering of the verdict. And common sense dictates sanctions cannot be pursued before the affected party finds out about the alleged discovery dereliction of his or her opponent. The true facts may not emerge until the end of the trial, as is the case here.

*Pate* v. *Channel Lumber Co.* (1997) 51 Cal.App.4th 1447 [59 Cal.Rptr.2d 919], published during the pendency of this appeal, is instructive. The *Pate* plaintiffs did not learn about the defendant's nondisclosure of documents requested in discovery until after their case-in-chief was concluded. The trial court imposed an evidence sanction precluding the defendant from using the documents. A judgment was entered for the plaintiffs.

The Court of Appeal, affirming, rejected the contention the trial court was unauthorized to impose sanctions because the tenants made no motion to compel prior to trial. The court found the argument "specious," noting, "Defendant has cited no case which holds a party who has received repeated assurances that all relevant documents have been produced must nonetheless file a motion to compel further responses in order to establish a right to sanctions should it turn out the assurances were false. [Citation.] In fact, Code of Civil Procedure section 2031, subdivision (*l*), states just the opposite. *It is only when responses are deemed inadequate or evasive that a motion to compel is required.* [Citation.]" (*Pate* v. *Channel Lumber Co, supra,* 51 Cal.App.4th at p. 1456, italics added.)

The Shermans could not have moved to compel production of documents they did not know existed, nor could they have sought sanctions before they determined KCI's responses were inadequate or evasive. By that time, the trial was over and the verdict was in. Because the opportunity for issue, evidence or terminating sanctions was gone, they sought entry of a default judgment, a new trial, or monetary sanctions. The court erred in determining the request came too late.

That is not to say a default judgment would have been a proper sanction. It would have placed the Shermans in a better position than if discovery had been obtained in the first place. (See, e.g., *McGinty* v. *Superior Court, supra,* 26 Cal.App.4th at p. 210 ["The courts . . . frown upon the extreme sanction of dismissal of a case for failure to make discovery, and recommend instead lesser sanctions of fine."].) But the trial court denied the motion for sanctions on the ground it could not grant relief after the conclusion of the trial, thus it did not consider the merits of the request. It should have reached the merits and found monetary sanctions absolutely *mandated.*

■ The Shermans also sought sanctions under section 128.5, which provides, "Every trial court may order a party, the party's attorney, or both, to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." (§ 128.5, subd. (a).) However, such expenses may not be imposed "except on notice contained in a party's *moving or responding* papers." (§ 128.5, subd. (c), italics added.)

The trial court narrowly interpreted the statute to require parties to raise the sanctions issue only in the *first* exchange of points and authorities. That interpretation is unreasonable. Bad faith tactics in supplemental and reply papers are equally as repugnant to the orderly conduct of legal proceedings as are bad faith tactics in the first round of papers. The point of section 128.5 is adequate notice: KCI had notice. Nothing more was required. The court should have decided the issue on its merits.[6]

The judgment and the order denying the Shermans' requests for sanctions under sections 2023 and 128.5 are reversed. The case is remanded for a new trial. The court *shall* order sanctions in favor of the Shermans and against KCI in an amount *at least* sufficient to compensate the Shermans for the costs, including attorney fees, of the first trial. The court may exercise its discretion to determine whether additional sanctions are warranted. The Shermans shall recover their costs on appeal.

Wallin, Acting P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied December 9, 1998.

---

[6]KCI contends the court *did* reach the merits of the issue and found section 128.5 sanctions were unwarranted. We think not. The court said, "There was bad faith in frivolous things. . . . The most I can say here, . . . it would not be reasonable, in my opinion, under the discovery statute, but I cannot find it's willful under section 128.5." At best, the ruminations are ambiguous; at worst, they are self-contradictory. We do not deem them a denial of the section 128.5 issue on the merits.