[No. B196684. Second Dist., Div. Eight. Mar. 27, 2009.]

MANFRED MULLER et al., Plaintiffs and Appellants, v.
FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER et al.,
Defendants and Appellants.

[No. B199316. Second Dist., Div. Eight. Mar. 27, 2009.]

MANFRED MULLER et al., Plaintiffs and Appellants, v.
SANAGARAM SHANTHARAM, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion entitled "The Appeals from the Order Granting a New Trial."

888

COUNSEL

Keesal, Young & Logan, Samuel A. Keesal, Jr., Albert E. Peacock III and Evelyn A. Christensen for Plaintiffs and Appellants.

Weiss, Martin, Salinas & Hearst, Andrew R. Weiss; Greines, Martin, Stein & Richland, Martin Stein, Barbara W. Ravitz and Kent J. Bullard for Defendant and Appellant Sanagaram Shantharam.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Stammer, McKnight, Barnum & Bailey and Carey H. Johnson for Defendant and Appellant Fresno Community Hospital and Medical Center.

OPINION

**FLIER, J.**—In a previous opinion (*Muller v. Daniel Freeman Hospitals, Inc.* (Mar. 3, 2005, B169141) [nonpub. opn.]), we reversed a jury verdict in favor of University Medical Center in Fresno, which is now known as the Fresno Community Hospital and Medical Center (FCH), Dr. James Davis and Dr. Sanagaram Shantharam, who were defendants in that case. The case was tried again to a jury and again resulted in a jury verdict for FCH and Dr. Shantharam, Dr. Davis having been dismissed prior to the second trial. The trial court granted the motion for new trial made by plaintiffs Manfred Muller and Rose Shoshana. The trial court concluded that it had erred in not allowing plaintiffs to call Dr. James London as a rebuttal witness. FCH and Dr. Shantharam appeal from this order.

After the trial court granted the motion for a new trial, plaintiffs filed a motion for sanctions based on alleged discovery abuses on the part of defendants that were connected with plaintiffs' failed attempt to call Dr. London as a rebuttal witness. The trial court denied the motion and plaintiffs appeal from that order.

We ordered the two appeals to be consolidated for purposes of record, oral argument and decision.

We affirm the orders granting the new trial and denying the motion for sanctions.

## FACTS

1. *Background*

Mr. Muller, a German-born sculptor living in Santa Monica, was severely injured on October 28, 1999, when the car he was driving to San Francisco

went off Interstate Route 5 and rolled over twice. He was first taken to FCH, where he was under the care of Drs. Davis and Shantharam. After 13 days, Mr. Muller was transferred to Daniel Freeman Hospital in Los Angeles for rehabilitation. At Daniel Freeman Hospital, Mr. Muller came under the care of the Neurology and Rehabilitation Medical Group (NRMG), Dr. Howard Chew and Dr. Jeffrey Bogosian. After a few days, Mr. Muller was transferred to the UCLA Medical Center, where his left arm between the elbow and wrist was amputated. As we relate below, the fact that the amputation was below the elbow became pivotally important to the second trial.

Mr. Muller and his wife, Rose Shoshana, filed an action wherein they sued FCH, Daniel Freeman Hospital, NRMG, and Drs. Davis, Shantharam, Bogosian and Chew. The core of the complaint was that defendants' alleged medical negligence resulted in the amputation of Mr. Muller's arm. Rose Shoshana sued for loss of consortium.

The case was tried to a jury. Evidence was presented from March 21, 2003, to April 14, 2003. The trial court granted directed verdicts to NRMG and Dr. Chew. The jury returned its special verdict on April 16, 2003, and found that FCH and Drs. Davis, Shantharam and Bogosian had not been negligent in their diagnosis, care and treatment of Mr. Muller. The case against Daniel Freeman Hospital was predicated on the theory that Dr. Bogosian was Daniel Freeman Hospital's agent; the verdict for Dr. Bogosian exonerated the hospital.

Our previous opinion affirmed the judgment as to Daniel Freeman Hospital and Dr. Bogosian but reversed as to the remaining defendants, i.e., FCH and Drs. Davis and Shantharam. In substantial part, our previous opinion was based on our conclusion that the trial court erred in precluding plaintiffs from calling more than one expert per issue. We found that, under the facts of the case, plaintiffs should have been allowed to call experts retained by defendants Daniel Freeman Hospital, NRMG, and Drs. Chew and Bogosian who would have testified, *in agreement with plaintiffs' theory of the case*, that Mr. Muller had sustained irreversible injury while hospitalized at FCH. According to plaintiffs' theory of the case, the injury was caused by a "compartment syndrome," a condition that we explained in our previous opinion.[1]

---

[1] "There are compartments in the forearm, hand, lower leg and feet through which the nerves and muscles run. These compartments are encased in a tough tissue which has very little elasticity. A compartment syndrome occurs when trauma to an area of the body contained [in] the compartment in question causes blood to flow to that area. The injured tissue in the compartment begins to swell and soon fills the inelastic compartment. The inability of the tissue to swell further and the increased blood flow causes the pressure in the compartment to escalate. The pressure squeezes the capillaries and blood vessels shut, with the result that

Plaintiffs' claim against FCH and Dr. Shantharam was based on the theory that Mr. Muller acquired the compartment syndrome while hospitalized at FCH and while he was under Dr. Shantharam's care at that facility. Specifically, when he arrived at FCH from the accident scene, all four bones in Mr. Muller's left hand were broken. Among other treatment, splint dressing was applied to the left hand. According to Dr. Moulton Johnson, plaintiffs' expert, danger signals indicating compartment syndrome began appearing on October 31, 1999 (Mr. Muller was admitted on Oct. 28) and intensified through November 1, 1999.[2]

Dr. London, who played a pivotal role in the second trial, was also the subject of our previous opinion. The aspect of Dr. London's role in our previous opinion that is germane to this appeal is that it is clear that Dr. London was an expert who had been designated as such by Dr. Chew.[3]

## 2. The Second Trial[4]

All experts from both sides agreed that the failure to timely diagnose a compartment syndrome in a hospital setting with a conscious patient is below the standard of care. It was also generally agreed that a tight cast can cause or aggravate an existing compartment syndrome. The question therefore was whether Mr. Muller sustained such an undiagnosed injury while at FCH. According to plaintiffs' experts, the answer was yes. The defense experts, on the other hand, opined that the injury to Mr. Muller's left hand and arm occurred during the crash when he sustained a crush injury.

Dr. London, who had been Dr. Chew's expert in the first trial, appeared as one of Mr. Muller's experts in the second trial.[5] Dr. London, a board-certified orthopedic surgeon, testified that Mr. Muller sustained a compartment syndrome at FCH and that if this condition is not treated within six to 12 hours,

---

muscle and nerve tissue within the compartment are starved of the necessary blood flow. Unless treated promptly, the muscle and nerve tissue die within eight to 24 hours. Once this happens, there is no treatment and no recovery and, as in Mr. Muller's case, amputation is the only remedy. [¶] A compartment syndrome is sometimes called the 'tight cast syndrome' because it can also be caused by a cast or dressing that becomes too tight due to swelling. The cast or dressing has to be loosened, in order to prevent pressure from building up in the affected compartment." (*Muller v. Daniel Freeman Hospitals, Inc., supra*, B169141.)

[2] Another reason we reversed the judgment in our previous opinion was that the trial court erroneously precluded Dr. Johnson from testifying that Dr. Shantharam's treatment of Mr. Muller fell below the standard of care. (*Muller v. Daniel Freeman Hospitals, Inc., supra*, B169141.)

[3] Erroneous limitations on Dr. London's testimony were yet another reason for our previous reversal. (*Muller v. Daniel Freeman Hospitals, Inc., supra*, B169141.)

[4] Opening statements commenced on August 18, 2006, and the jury returned its verdict on September 14, 2006.

[5] Mr. Muller's expert at the first trial, Dr. Johnson, did not testify at the second trial.

it results in the death of the muscles in the affected compartment. According to Dr. London, Dr. Shantharam's performance was below the standard of care because he failed to diagnose and treat Mr. Muller's compartment syndrome. Dr. London did not think that Mr. Muller had sustained a crush injury.

Drs. Stuart Kushner and Clark Davis, who had been experts for Daniel Freeman Hospital and NRMG in the first trial, both testified in the second trial that Mr. Muller sustained a compartment syndrome while at FCH. They were joined in this opinion by Dr. Luther Cobb, a board-certified general surgeon, and Dr. Bogosian.[6] Not all of these experts found that Dr. Shantharam fell below the standard of care; as an example, Dr. Clark Davis, an orthopedic surgeon specializing in hand surgery, had no opinion on this subject.

Four physicians at UCLA Medical Center, including Dr. Roy Meals, the treating orthopedist at UCLA Medical Center, were of the opinion that Mr. Muller sustained a compartment syndrome.

The first witness called by plaintiffs testified on August 18, 2006. Thereafter, plaintiffs' witnesses testified on three successive trial days, i.e., on August 24, August 25 and August 28, 2006. On the fifth trial day, August 29, the defense called its first witness out of order. On the next day, August 30, plaintiffs called one witness and the defense called two witnesses, including Dr. Michael Botte, whose testimony we summarize below.

The testimony that is central to both appeals took place on the next to the last day of testimony, i.e., on September 1, 2006. After that day, only Mr. Muller's spouse testified on September 5, 2006. All parties rested after she concluded her short testimony on September 5, 2006.

According to Dr. Botte's testimony given on August 30, Mr. Muller never sustained a compartment syndrome but rather a crush injury due to severe trauma to the left arm and wrist. Dr. Botte also thought that Mr. Muller had developed a secondary infection at Daniel Freeman Hospital. Dr. Botte concluded that both Dr. Shantharam and Dr. James Davis (Dr. Davis),[7] the chief of surgical critical care at FCH, complied with the standard of care and that they could have done nothing to alter the sad course of events for Mr. Muller.

The testimony on September 1, 2006, began with the defense calling Dr. Davis. Dr. Davis testified on direct examination that Mr. Muller never had

[6] Dr. Bogosian was a treating physician at Daniel Freeman Hospital.

[7] Dr. *Clark* Davis was a plaintiffs' expert. (Text, at p. 893, *ante.*)

a compartment syndrome but that he had a dead hand and arm from the crush injury. On cross-examination, he was asked to explain how it was that Mr. Muller was allowed to leave FCH in Fresno without any notation in his medical record that he had a dead hand and arm. Dr. Davis's attempts to answer were not satisfactory[8] and he was asked yet again how it was that Mr. Muller ended up with a dead hand and arm. This question he answered by stating that "[i]t's the natural physiology of the injury."

Counsel didn't really allow him to explain what he meant by this. So, on redirect, counsel for FCH asked Dr. Davis to "expand on why you think the natural physiology of the injury Mr. Muller sustained in the car accident evolved the way it did." After a lengthy preface, Dr. Davis came to the point: "[O]ne of the features of compartment syndrome is it kills what's in the compartment from the origin of the muscle all the way down to where the muscle inserts on—on the other bony structure. . . . [T]he muscle in that whole compartment is in the same sheath so it's exposed to all the same pressure. [¶] So, when you get a compartment syndrome, the muscle in the whole compartment dies. So you don't save the leg below the knee,[9] you have to take it off at the knee or do an above knee amputation, and the kid's don't [sic] pitch high school ball. If you get it in the upper extremity, then you lose the arm at the elbow or even above the elbow. You don't have viable muscle below the elbow to close over the bony stump. That's what I meant by the natural history of the disease. And it can take several weeks to slowly progress."

Neither counsel nor Dr. Davis was finished with this topic. After Dr. Davis noted that Mr. Muller had a below the elbow amputation, which meant that there was viable muscle below the elbow joint, counsel asked: "Explain that. Why does the fact that he has a below elbow amputation rule out a compartment syndrome?" Dr. Davis answered at some length that in a compartment syndrome, all the muscle in the compartment dies but that if Mr. Muller "had living muscle to close over the bone, that wasn't dead from a compartment syndrome." Counsel asked: "Mr. Muller had quite a bit of muscle below the elbow joint that survived, didn't he? [¶] A [Dr. Davis:] I don't know. I haven't seen his operative note. I've noticed that he does, in fact, have an elbow joint. He does seem to have some below the elbow. So I would say he had enough muscle to close over the bone. [¶] Q And have you ruled out a compartment syndrome in his case? [¶] A Yes, sir, I believe so. [¶] Q And how strongly do you believe that? [¶] A That's what I believe."

---

[8] Dr. Davis's answers tended to be discursive and roundabout.

[9] Dr. Davis was referring to the case of another patient that he had discussed in his testimony.

Still on Friday, September 1, 2006, the next to testify was FCH's expert, Dr. Michael Kulick. Dr. Kulick testified that Mr. Muller did not have a compartment syndrome but that he had a crush injury. He reiterated the point that in a compartment syndrome, all the muscle in the compartment dies. Dr. Kulick noted that the operative report from UCLA Medical Center, where the amputation was done, stated that there was muscle on the forearm to cover up the stump. This was consistent with a crush injury and not consistent with a compartment syndrome.

The last to testify on September 1 was Dr. Shantharam. He had been previously called by plaintiffs under Evidence Code section 776 but the subject that we have covered above did not come up in his prior testimony. At the end of his direct examination by his counsel, the following transpired: "Q [Dr. Shantharam's counsel:] Now, we've heard testimony earlier today that, if there had been a compartment syndrome, you would expect the entire muscle throughout the compartment to have died? [¶] A [Dr. Shantharam:] Correct. [¶] Q And you understand now that the entire muscle in Mr. Muller's compartment did not die? [¶] A It did not die. And one would be going through an amputation above the elbow if it is a compartment syndrome. [¶] MR. WEISS [Dr. Shantharam's counsel]: That's all I have, Your Honor. Thank you."

Plaintiffs' counsel did not cross-examine these three witnesses on the topic of the below the elbow amputation nor did counsel object to any of this testimony. After testimony was concluded on September 1, plaintiffs' counsel stated that plaintiffs' counsel had been in touch over the lunch hour with Dr. London, "who's going to be here first thing in the morning to rebut some of the new evidence that we heard today." Dr. Shantharam's lawyer immediately objected "to the extent he's [Dr. London] going to be expressing opinions, because that's improper rebuttal." When the trial court asked for an offer of proof, plaintiff's counsel stated: "Your Honor, today for the first time, despite all of the experts who have testified in three weeks, today was the first day that the defendants put on experts who said that, whether or not the amputation was below elbow or above, was somehow indicative of whether this was a compartment syndrome. This was new. They didn't ask Dr. [Botte]. They didn't ask any of the other experts about this. We intend to call Dr. [London] back to simply say that, whether or not it's a below elbow or an above elbow amputation, is not indicative of whether or not this was a compartment syndrome. Plain and simple." The court requested authorities on the subject by the next Tuesday morning, when the trial would reconvene.

On Tuesday, September 5, Dr. Shantharam's counsel filed a written memorandum, which stated that defense expert Dr. Kulick had testified that in a compartment syndrome all of the muscle in the compartment dies and that

plaintiffs wanted to present the contrary testimony of Dr. London. The memorandum stated that Dr. London had read Dr. Kulick's deposition and that he was therefore aware of his opinions but that plaintiffs had not covered this subject when they had examined Dr. London during their case-in-chief. The memorandum also contended that Code of Civil Procedure section 2034.310, subdivision (b)[10] foreclosed plaintiffs from calling Dr. London in rebuttal.

During the hearing on this matter held on Tuesday morning,[11] FCH's counsel stated that Dr. Kulick had testified in his deposition that in a compartment syndrome all of the muscle in the compartment dies. Counsel read the following question and answer from Dr. Kulick's deposition: " 'Question: And what was inconsistent with a compartment syndrome at the time of amputation? [¶] Answer: Most of the compartment syndromes I have been involved with, the entire compartment is involved. Reading the reports from, I believe, Dr. Meals [from UCLA Medical Center], he had the proximal[12] portion of his forearm completely spared which for me is more consistent with what I think happened with a crushed component.' "

After listening to argument by both sides, the trial court concluded, clearly referring to Code of Civil Procedure section 2034.310, subdivision (b) (see fn. 10, *ante*), that "What I think you're [plaintiffs] offering here is rebuttal evidence. Under the law what you're allowed to do is add foundational fact, not contrary evidence. I'm not going to allow you to call Dr. London at this time."

In its verdict, the jury specifically found that Mr. Muller did not have a compartment syndrome while at FCH.

### 3. *The Order Granting a New Trial*

The trial court granted the motion for new trial on the ground that an error of law had been committed. (Code Civ. Proc., § 657.) We set forth the court's minute order: "Dr. London's rebuttal testimony was improperly excluded. He should have been permitted to testify on the issue of whether the below the

---

[10] "A party may call as a witness at trial an expert not previously designated by that party if either of the following conditions is satisfied: [¶] . . . [¶] (b) That expert is called as a witness to impeach the testimony of an expert witness offered by any other party at the trial. This impeachment may include testimony to the falsity or nonexistence of any fact used as the foundation for any opinion by any other party's expert witness, but may not include testimony that contradicts the opinion." (Code Civ. Proc., § 2034.310, subd. (b).)

[11] It is not disputed that Dr. London was outside the courtroom and ready to testify on Tuesday, September 5.

[12] In this context, "proximal" refers to above the elbow and "distal" to below the elbow.

elbow amputation ruled out the existence of the compartment syndrome. The court's ruling was based upon CCP section 2043.10(b) [*sic*]. This section applied only to non-designated expert witnesses. Dr. London was a properly designated expert; therefore, this section did not apply to his proposed rebuttal testimony. [¶] The defendants presented no evidence to this court to show that they had at any time before this trial informed the plaintiff that they would be presenting expert testimony showing that the location of the amputation was a factor in determining the existence of a compartment syndrome. The plaintiff then, did not present evidence on this issue during their case in chief and they were unable to cross examine Dr. Botte, a key defense expert, on this issue. [¶] The exclusion of Dr. London's proposed rebuttal testimony was prejudicial. The defense argued to the jury that the location of the amputation was significant in showing the non-existence of a compartment syndrome. Since the plaintiff was precluded from introducing contrary expert opinion they were placed in an unfair position. This evidence was likely to have affected the outcome of the trial."

## DISCUSSION

### THE APPEALS FROM THE ORDER GRANTING A
### NEW TRIAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### THE APPEAL FROM THE ORDER DENYING THE
### MOTION FOR SANCTIONS

The motion for a new trial was granted on December 13, 2006. On January 31, 2007, plaintiffs filed a motion for sanctions against Dr. Shantharam and FCH. The motion was predicated on defendants' failure to disclose in a timely fashion the theory that the location of the amputation below the elbow ruled out a compartment syndrome.

The trial court denied the motion for sanctions on March 3, 2007. The court found that there was no evidence that defendants were "sandbagging" and no evidence that defendants "knowingly and intentionally concealed Dr. Kulick's opinion." The court also found that defendants' conduct in this case did "not come close" to the misconduct in *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152 [79 Cal.Rptr.2d 641], the case on which plaintiffs' motion relied.

---

*See footnote, *ante*, page 887.

### 1. *The Order Denying the Motion for Sanctions Is Appealable as a Collateral Order*

Relying principally on *Wells Properties v. Popkin* (1992) 9 Cal.App.4th 1053, 1055 [11 Cal.Rptr.2d 845], Dr. Shantharam filed a motion to dismiss the appeal from the order denying plaintiffs' motion for sanctions. We denied the motion before the briefs were filed but indicated that we were prepared to reconsider the issue when the briefing was completed.

The question whether the denial of a motion for sanctions is appealable is far from settled. *Wells Properties v. Popkin* is authority for the negative while *Shelton v. Rancho Mortgage & Investment Corp.* (2002) 94 Cal.App.4th 1337 [115 Cal.Rptr.2d 82] and *In re Marriage of Dupre* (2005) 127 Cal.App.4th 1517 [26 Cal.Rptr.3d 328] stand for the affirmative of the proposition.

In the context of this case, the only theory under which the order of denial would be appealable is the collateral order doctrine. Because there is no judgment in this case, the order granting a new trial having been entered, which we affirm, the denial order cannot be appealable under Code of Civil Procedure section 904.1, subdivision (a)(2) (appeal may be taken from an order made after a *judgment* appealable under subd. (a)(1) of § 904.1). This eliminates *Shelton v. Rancho Mortgage & Investment Corp.*, a case in which the denial of a motion for sanctions occurred after the entry of a judgment and when the appellate court, after close analysis of what constitutes an appealable postjudgment order, concluded that the denial of sanctions was appealable as such a postjudgment order. (*Shelton v. Rancho Mortgage & Investment Corp., supra*, 94 Cal.App.4th at pp. 1343–1345.)

 " 'A necessary exception to the one final judgment rule is recognized where there is a final determination of some collateral matter distinct and severable from the general subject of the litigation. If, e.g., this determination requires the aggrieved party immediately to pay money or perform some other act, he is entitled to appeal even though litigation of the main issues continues. The determination is substantially the same as a final judgment in an independent proceeding.' " (*Yeboah v. Progeny Ventures, Inc.* (2005) 128 Cal.App.4th 443, 449, fn. 2 [27 Cal.Rptr.3d 150], italics omitted, quoting what is now 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 99, pp. 162–163.) Witkin notes that the early cases on the collateral order doctrine applied the doctrine only when the order in question directed the payment of money or the performance of some other act. (9 Witkin, *supra*, Appeal, § 106, p. 169.) "In later decisions, this limitation was not always observed, perhaps partly because more than one theory of appealability was loosely invoked and discussed." (*Ibid.*) (Among the cases digested by Witkin that have disregarded this limitation is *In re Marriage of Dupre, supra*, 127

Cal.App.4th at p. 1523.) Other texts have also noted that the Courts of Appeal have been divided on this question, some holding that these limitations apply and others ignoring them entirely. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶¶ 2:79 to 2:79.5, pp. 2-46 to 2-47; 4 Cal.Jur.3d (2007) Appellate Review, § 30, p. 65, fn. 9 & accompanying text.)

Relying on the cases that require the collateral order to direct the payment of money or the performance of an act, Dr. Shantharam contends that because the order denying the motion for sanctions required neither act, the order is not appealable. We agree that the order in question did not require the payment of money or the performance of an act. Thus, we must address the question whether these limitations actually apply to the collateral order doctrine.

One reason for the disagreement among the Courts of Appeal is that the Supreme Court has at different times endorsed these limitations and at other times has disregarded them. Thus, in the frequently cited opinion in *Sjoberg v. Hastorf* (1948) 33 Cal.2d 116, 119 [199 P.2d 668], the court, after noting the existence of the collateral order doctrine emphatically went on to state: "It is not sufficient that the order determine finally for the purposes of further proceedings in the trial court some distinct issue in the case; it must direct the payment of money by appellant or the performance of an act by or against him."

Seven years later, in *Meehan v. Hopps* (1955) 45 Cal.2d 213 [288 P.2d 267] (*Meehan*), the court disregarded the limitations on the collateral order doctrine that the order must require the payment of money or the performance of an act. Hopps, the defendant, moved to enjoin the plaintiffs' lawyers from participating in the case or disclosing confidential information that these lawyers had learned while, in a previous case, they had represented Hopps. The motion was denied and the sole issue was whether the order denying the motion was appealable. The Supreme Court gave two reasons why the order was appealable. First, Hopps could have brought an independent action with the same objectives as the motion, in which event the denial of an injunction would have presented an appealable order. (*Id.* at pp. 215–216.) Second, the disqualification of counsel was "unquestionably collateral to the merits of the case" (*id.* at pp. 216–217), and "[b]ecause the trial court's order denying Hopps' motion left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, the order was final for purposes of appeal" (*id.* at p. 217). The Supreme Court made no mention of the limitations on the collateral order doctrine that the order must direct the payment of money or the performance of an act. The omission to refer to these limitations is understandable, as an order disqualifying an attorney simply does not involve the payment of money or the performance of an act.

A review of some of the decisions of the Supreme Court handed down after *Meehan* suggests, at first blush, that the court has not been consistent in dealing with the limitations that the order must call for the payment of money or the performance of an act.

In *Southern Pacific Co. v. Oppenheimer* (1960) 54 Cal.2d 784, 786 [8 Cal.Rptr. 657, 356 P.2d 441], the court set forth the collateral order doctrine without reference to the foregoing limitations; the court held that orders regarding discovery are not collateral orders. In *Takehara v. H. C. Muddox Co.* (1972) 8 Cal.3d 168, 171 [104 Cal.Rptr. 345, 501 P.2d 913], the court held, citing inter alia *McClearen v. Superior Court* (1955) 45 Cal.2d 852, 855 [291 P.2d 449], that an order granting or denying a lien under Code of Civil Procedure former section 688.1 was appealable as a collateral order. No mention was made of the limitation that a collateral order must also involve the payment of money or the performance of an act. Indeed, it is difficult to see how an order granting or denying a lien could involve either one of these limitations.

In *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368–369 [134 Cal.Rptr. 197, 556 P.2d 297], where the appeal was from an order modifying spousal support, the court stated the collateral order doctrine in its pre-*Meehan* form[18] and held the order to be appealable. *Bauguess v. Paine* (1978) 22 Cal.3d 626, 634, footnote 3 [150 Cal.Rptr. 461, 586 P.2d 942], was a case when an order directing an attorney to personally pay $700 in sanctions was held appealable as a final order on a collateral matter directing the payment of money. And in *I. J. Weinrot & Son, Inc. v. Jackson* (1985) 40 Cal.3d 327, 331 [220 Cal.Rptr. 103, 708 P.2d 682], the trial court sustained a demurrer, the plaintiff sought and was denied reconsideration and the defendant moved for and was awarded $250 in sanctions. The Supreme Court held the order awarding sanctions to be appealable as a final order on a collateral matter directing the payment of money.

The apparent inconsistency in the Supreme Court's treatment of the limitations on the collateral order doctrine has caused some appellate courts to declare themselves firmly in the pre-*Meehan*, i.e., the *Sjoberg v. Hastorf*, camp. Thus, in *Efron v. Kalmanovitz* (1960) 185 Cal.App.2d 149, 156 [8 Cal.Rptr. 107], the Court of Appeal stated that "[a] careful reading of the *Meehan* decision convinces us that as to the second ground upon which the court found appealability, it was concerned only with the question of collaterality and finality. . . . [T]here is nothing in the opinion in *Meehan* indicating

---

[18] "When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken." (*In re Marriage of Skelley, supra*, 18 Cal.3d at p. 368.)

an intent to delimit or overrule *Sjoberg* and its own decisions cited in *Sjoberg* to the effect that not only must the order of a collateral issue be final to be appealable, but that it must also direct the payment of money by appellant or the performance of an act by or against him."

We find that it is somewhat misleading to state that *Meehan* was "only" concerned with "collaterality and finality"—the question in the case was whether the order denying disqualification was a final order on a collateral matter and therefore appealable, and the answer was yes. Thus, the fact remains that *Meehan* held the order to be a collateral, appealable order without reference to any limitations.

*Conservatorship of Rich* (1996) 46 Cal.App.4th 1233, 1237 [54 Cal.Rptr.2d 459], contains a particularly strong endorsement of *Sjoberg v. Hastorf* and the limitations on the collateral order doctrine, as well as a vote of confidence in *Efron v. Kalmanovitz*.[19] *Conservatorship of Rich* also states that the Supreme Court has " 'consistently limited the collateral order doctrine to situations where a trial judge orders either payment of money or the performance of some act' " (see fn. 19, *ante*), a conclusion that is refuted by *Meehan, Southern Pacific Co. v. Oppenheimer, Takehara v. H. C. Muddox Co.*, and *McClearen v. Superior Court.*

As we have noted, we do not think that *Meehan* can be dismissed, as the court did in *Efron v. Kalmanovitz*, because it was "only" concerned with "collaterality and finality." Whether the order was final and collateral *and therefore appealable* was in fact the issue that was decided in that case. But *Meehan* is not only authoritative, this decision also answers, albeit indirectly, the question what role the limitations of a payment of money or the performance of an act play in the collateral order doctrine.

---

[19] "It is true that the *Meehan* case, which postdates *Sjoberg* [*v. Hastorf*], contains language appearing to find an attorney disqualification order appealable as a final order on a collateral matter without considering whether it meets the payment-of-money/performance-of-an-act requirement. (45 Cal.2d at pp. 216–217.) However, as explained in *Efron* v. *Kalmanovitz*[, *supra*,] 185 Cal.App.2d 149, 154–156 [8 Cal.Rptr. 107], a close reading of the pertinent passage in *Meehan* warrants the conclusion that that [*sic*] the high court was concerned only with the issue of finality and did not intend to overrule its own holding in *Sjoberg* that there is a second indispensable requirement to the collateral order exception. History has borne out the wisdom of this analysis, for since then '[t]he California Supreme Court has consistently limited the collateral order doctrine to situations where a trial judge orders either payment of money or the performance of some act.' (*Samuel* v. *Stevedoring Services* (1994) 24 Cal.App.4th 414, 418 [29 Cal.Rptr.2d 420], citing *Bauguess* v. *Paine*[, *supra*,] 22 Cal.3d 626, 634, fn. 3; *In re Marriage of Skelley, supra*, 18 Cal.3d 365, 368; *Sarracino* v. *Superior Court* (1974) 13 Cal.3d 1, 9 [118 Cal.Rptr. 21, 529 P.2d 53].) [¶] We conclude that judicially compelled payment of money or performance of an act remains an essential prerequisite to the appealability of a final order regarding a collateral matter." (*Conservatorship of Rich, supra*, 46 Cal.App.4th at p. 1237.)

An order disqualifying or denying the disqualification of counsel, the latter being the order on appeal in *Meehan*, stands alone; it does not require the payment of money or the performance of an act. There are other collateral orders that have been held to be appealable that do not involve a payment of money or the performance of an act. An order granting a creditor's lien upon a cause of action (*Bandy v. Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 230, 233 [126 Cal.Rptr. 890]), an order denying a request for pendente lite attorney fees (*Askew v. Askew* (1994) 22 Cal.App.4th 942, 964 [28 Cal.Rptr.2d 284]), and an order approving a receiver's accounting (*Schreiber v. Ditch Road Investors* (1980) 105 Cal.App.3d 675, 677, fn. 1 [164 Cal.Rptr. 633]) are examples of such orders.

■ The apparent inconsistency in the Supreme Court's opinions evaporates when the focus is on the nature of the order, i.e., on whether the order itself does or does not require a payment of money or the performance of an act. When the order does not require a payment of money or the performance of an act, the Supreme Court will find the order appealable without reference to these limitations, *as long as the court is satisfied that the order is truly collateral.* (See *Meehan, supra,* 45 Cal.2d 213; *Takehara v. H. C. Muddox Co., supra,* 8 Cal.3d 168; *McClearen v. Superior Court, supra,* 45 Cal.2d 852.)

This suggests that the supposed limitations of a payment of money and the performance of an act are in actuality indications that the order in question is collateral to the main action. In other words, when the order directs the payment of money or the performance of an act, it is likely that the matter addressed in the order is collateral to the main action. Viewed from this perspective, it is logical that orders awarding pendente lite attorney fees (*In re Marriage of Skelley, supra,* 18 Cal.3d at pp. 368–369), orders directing the parties to share in the payment of discovery costs (*San Diego Unified Port Dist. v. Douglas E. Barnhart, Inc.* (2002) 95 Cal.App.4th 1400, 1402 [116 Cal.Rptr.2d 65]), and an order unsealing court records (the performance of an act) (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 297 [116 Cal.Rptr.2d 833]) are orders that are collateral to the main action.

A good illustration of the unnecessary strain that the payment of money or performance of an act limitation places on the collateral order doctrine is *Machado v. Superior Court* (2007) 148 Cal.App.4th 875, 882–883 [55 Cal.Rptr.3d 902]. In that decision, the Court of Appeal expressed a doubt that an order denying a disqualification motion is a collateral order because such an order does not require the payment of money or the performance of an act.[20] On the other hand, according to the court in *Machado*, an order

---

[20] "An order granting or denying a disqualification motion is an appealable order. [Citing, inter alia, *Meehan, supra,* 45 Cal.2d at p. 215.] [¶] The California Supreme Court has given two reasons why such an order is appealable: First, it is an injunctive order (see Code Civ. Proc.,

granting a disqualification motion compels the hiring of a new attorney, which satisfies the limitation of the performance of an act. (148 Cal.App.4th at p. 882.) But an order disposing of a motion to disqualify an attorney either is, or is not, collateral to the main action; the better view, without a doubt, is that it is collateral. This conclusion results from an analysis of the relationship of the order of disqualification to the main action and it is not based on whether an order is granted or denied. All the same, if *Machado* is to be followed, an order denying a disqualification motion is not appealable while an order granting the motion is appealable. This does not make sense.

■ The artificiality of these supposed limitations is also made apparent by the holding that "[w]here, as here, the notice order[21] is neither final nor collateral, the fact that it directs payment of money or the performance of an act is immaterial." (*Steen v. Fremont Cemetery Corp.* (1992) 9 Cal.App.4th 1221, 1229 [11 Cal.Rptr.2d 780].) In other words, the real test is whether the order is collateral and final as to the collateral matter, not whether the order has the effect of requiring payment of money or the performance of an act.

It is surely of some significance that the rather considerable body of federal law on the collateral order doctrine that begins with *Cohen v. Beneficial Loan Corp.* (1949) 337 U.S. 541 [93 L.Ed. 1528, 69 S.Ct. 1221], makes absolutely no mention of the limitations on the collateral order doctrine that we have discussed. (15A Wright et al., Federal Practice and Procedure (1992) Jurisdiction, § 3911, pp. 329–371.) In other words, the collateral order doctrine has functioned in the federal courts without these limitations since its inception in 1949.

■ The fact is that these supposed limitations on the collateral order doctrine do not really speak to the fundamental concepts behind this doctrine. "The reason for the one judgment rule is that 'piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and . . . a review of intermediate rulings should await the final disposition of the case.' " (*Knodel v. Knodel* (1975) 14 Cal.3d 752, 760 [122 Cal.Rptr. 521, 537 P.2d 353], quoting what is now 9 Witkin, Cal. Procedure, *supra*, Appeal, § 96, pp. 158–159.) "In *Union Oil Co.* v. *Reconstruction Oil Co.* (1935) 4 Cal.2d 541, 545 [51 P.2d 81], the court stated that the test is whether an order is 'important and essential to the correct determination of the main issue.' If the order is 'a necessary step to that end,' it is not collateral." (*Steen v.*

§ 904.1, subd. (a)(6)); second, it is a final order collateral to the main action. (*Meehan, supra*, 45 Cal.2d at pp. 215–217.) The second ground has been questioned because it seems to conflict with authority limiting those collateral orders that may be appealed. The general rule is that only those collateral orders which compel the payment of money or the doing of some act are appealable." (*Machado v. Superior Court, supra*, 148 Cal.App.4th at p. 882.)

[21] The order was directing service of notice of a class action on the members of the class.

*Fremont Cemetery Corp., supra*, 9 Cal.App.4th at p. 1227.) Thus, the essence of the collateral order doctrine is that the matter concluded by the order should be truly "distinct and severable from the general subject of the litigation," to use Witkin's phrase. (9 Witkin, *supra*, Appeal, § 99, p. 162.) It is only then that a piecemeal disposition and multiple appeals in a single action will be avoided.

But this is not all there is. An aspect of the collateral order doctrine that has received relatively little attention in California cases is the reasons for the doctrine. As the United States Supreme Court has put it, the collateral order doctrine in federal courts must involve a claim of right "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." (*Cohen v. Beneficial Loan Corp., supra*, 337 U.S. at p. 546.) The interest that is served by the collateral order doctrine is the expeditious completion of appellate review, when that can be accomplished without implicating the merits of the underlying controversy. The collateral order doctrine also preserves appellate review when, without the invocation of this doctrine, appellate review would be foreclosed.

This case illustrates both of the principal reasons for the invocation of the collateral order doctrine.

First. The matter of sanctions to be awarded for defendants' alleged misconduct during and prior to the second trial of this case is of no relevance to the proceedings that will take place upon the remand of this case. If the order denying sanctions is to be reviewed on appeal, there is no reason to defer that review to the appeal from the eventual judgment, even assuming that review can in fact be deferred to that point in the future (see text, *post*). The sanctions are "too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." (*Cohen v. Beneficial Loan Corp., supra*, 337 U.S. at p. 546.) The principle that is served here is that it is preferable to resolve controversies whenever it is possible to do so rather than defer a matter that is in all respects ripe for resolution.

Second. There is also the very real question whether the order denying sanctions would be reviewable from a judgment following a third trial in this case, assuming that there is a third trial.[22] The order denying sanctions will not be a part of the trial proceedings of the third trial and there is therefore a question whether an eventual judgment following the third trial could properly incorporate the order denying the motion for sanction entered on March

---

[22] An important aspect of the federal collateral order doctrine is that it preserves appellate review in situations when, absent an appeal from the order, the matter will evade appellate review entirely. (15A Wright et al., Federal Practice and Procedure, *supra*, Jurisdiction, § 3911.3, pp. 396–419.)

5, 2007. And if there is no third trial and no judgment, even the possibility of incorporating the order denying sanctions into a judgment, assuming such incorporation would be proper, would disappear. We think that the denial of sanctions is a matter "too important to be denied review." (*Cohen v. Beneficial Loan Corp.*, *supra*, 337 U.S. at p. 546.)

We do not hold that generally all orders denying motions for sanctions are appealable as collateral orders. In this case, there is no judgment and there may never be a judgment. Under these circumstances, the order denying the motion for sanctions is appealable as a collateral order.

2. *The Order Denying the Motion for Sanctions Is Affirmed*

Plaintiffs' motion for sanctions relied on a mix of statutory and case law for authority that sanctions could be imposed on defendants for their failure to disclose in a timely fashion their theory that the location of the amputation ruled out a compartment syndrome. The authorities that the motion cited were Code of Civil Procedure section 128.7 and former section 2023[23] and *Sherman v. Kinetic Concepts, Inc.*, *supra*, 67 Cal.App.4th 1152. On appeal, plaintiffs contend among other things that "[o]nly with an award of sanctions can the Court make the playing field level again from an economic stand point [*sic*] for a third trial and deter medical malpractice defendants and their counsel from using the damages and fee caps[24] as a means of defeating otherwise valid claims." The factual predicate of the motion for sanctions is the assumption that defendants were at all times aware of the below the elbow amputation theory and deliberately delayed disclosing that theory until the end of the trial.

We begin with the observation that we have already made (in the unpublished portion of this opinion) that, under the interpretation of Code of Civil Procedure former section 2034 set forth in *Bonds v. Roy* (1999) 20 Cal.4th 140, 147 [83 Cal.Rptr.2d 289, 973 P.2d 66], the sanction for attempting to present an expert opinion at trial that was not contained in the expert witness declaration is the exclusion of that expert opinion. *Monetary* sanctions are authorized in the instance of motions addressing protective orders covering expert testimony, expert fees, the augmentation of expert lists and declarations and the filing of tardy expert witness information (respectively, Code Civ. Proc., §§ 2034.250, subd. (d), 2034.470, subd. (g), 2034.630 & 2034.730). We find no authority in the statutes for the imposition

---

[23] Code of Civil Procedure former section 2023 was repealed effective July 1, 2005, and reenacted without substantive changes as sections 2023.010, 2023.020, 2023.030, and 2023.040.

[24] The reference is to the limitations in medical malpractice actions on noneconomic damages and attorney fees.

of monetary sanctions for disclosing for the first time during the trial a theory that the expert did not disclose in the expert witness declaration.

In *Sherman v. Kinetic Concepts, Inc., supra,* 67 Cal.App.4th 1152, a products liability case against the manufacturer of hospital beds, the defendant admitted that its product malfunctioned four or five times; the defendant concealed and failed to disclose 24 separate incident reports of malfunctioning beds. The Court of Appeal approved the imposition of sanctions, including monetary sanctions, under Code of Civil Procedure section 2023.030.[25] (*Sherman v. Kinetic Concepts, Inc., supra,* at pp. 1162–1163.)

■ The disclosure of expert witness information and testimony is specifically regulated in Code of Civil Procedure sections 2034.010 through and including 2034.730, i.e., in part 4, title 4, chapter 18, of the Code of Civil Procedure. Specifically, Code of Civil Procedure section 2034.300, subdivision (b) provides for the exclusion of testimony as a sanction for the failure to submit a witness declaration, which *Bonds v. Roy* tells us includes an inaccurate declaration. ■ "It is well settled, also, that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." (*Rose v. State* (1942) 19 Cal.2d 713, 723–724 [123 P.2d 505].) ■ Thus, we must look to section 2034.300, subdivision (b) and not the general provisions providing for sanctions for "conduct that is a misuse of the discovery process" found in Code of Civil Procedure section 2023.030.

■ Finally, Code of Civil Procedure section 128.7 does not apply, when it comes to the memorandum filed by Dr. Shantharam on September 5, 2006, which contended that under Code of Civil Procedure section 2034.310 Dr. London could not be called as a rebuttal witness. Section 128.7 provides for the imposition of sanctions when a pleading, memorandum or motion advances a frivolous contention; a motion under section 128.7 must be served 21 days before it is filed. (§ 128.7, subd. (c)(1).) That was not done in this case. Nor, of course, can FCH be held liable under section 128.7 for Dr. Shantharam's memorandum.

■ Although the reason that the trial court gave for denying the motion for sanctions is not the one that we have concluded applies to this motion, we affirm the ruling denying the motion. It is the ruling, and not the reason for

---

[25] The opinion of the court in *Sherman v. Kinetic Concepts, Inc., supra,* 67 Cal.App.4th at page 1163, referred to Code of Civil Procedure former section 2023. (See fn. 23, *ante.*)

the ruling, that is reviewed on appeal. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

## DISPOSITION

The orders granting the new trial and denying the motion for sanctions are both affirmed. Manfred Muller and Rose Shoshana are to recover their costs in B196684. Dr. Sanagaram Shantharam and Fresno Community Hospital and Medical Center are to recover their costs in B199316.

Rubin, Acting P. J., and Bigelow, J., concurred.