Filed 6/26/25  Shen v. Xia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SOPHIE SHEN, | H050937 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 19CV360975) |
| v. | |
| WEIPING XIA, | |
| Defendant and Appellant. | |

In December 2019, respondent Sophie Shen (Shen) filed the present suit against her brother, appellant Weiping Xia (Xia), arising out of her investment of more than $1.2 million in Western Water Corporation (WWC), a corporation controlled by Xia. Shen alleged that Xia represented to her that she owned 45 percent of WWC as a result of her contributions.  Shen alleged that in early 2018, Xia sold WWC for approximately $100 million, and he failed to disclose the sale or distribute her share of the proceeds.  Shen asserted various claims against Xia sounding in tort and contract arising out of his failure to pay Shen her share of the WWC sales proceeds.

The case proceeded to a 15-day trial.  The jury rendered a decision on November 15, 2022, that included a verdict in favor of Shen on her claim against Xia for conversion and an award of $21 million in damages.  The court entered judgment in Shen's favor in conformity with the verdict on January 6, 2023.

Xia filed three postjudgment motions: (1) a motion for new trial pursuant to section 657 of the Code of Civil Procedure;[1] (2) a motion for terminating sanctions and monetary sanctions under the California Civil Discovery Act, section 2016.010 et seq.; and (3) a motion to stay enforcement of the judgment under section 918. The thrust of Xia's position was that there were critical documents—text messages from WWC's accountant, Clint Wong, to Shen—that she failed to produce during discovery, and that the failure to produce them prejudiced Xia at trial. On March 15, 2023, the trial court denied all but one of Xia's motions; the court granted his motion for monetary sanctions.

On appeal, Xia challenges the trial court's order, contending that "[t]his case presents one of the rare instances where terminating sanctions or a new trial were warranted." Xia argues further that the court erred in denying his motion in limine to exclude evidence concerning a Bank of America account that was not in Xia's name but for which he held a power of attorney. He contends the court erred in admitting these bank records.

We conclude that the trial court did not err. Accordingly, we will affirm the order.

## I. FACTUAL BACKGROUND

### A. Relevant Entities

Western Water Group (WWG) owned and operated several wastewater treatment plants in poor areas of China. WWG is a wholly owned subsidiary of WWC.

Han's Technologies, Inc. (HTI) was an entity created by Xia in 1997. It predated WWC and WWG. As explained by one of the trial witnesses, James Li, HTI originally was in the business of selling equipment to wastewater treatment companies in China.[2] Xia testified that WWG was one of HTI's customers.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

[2] James Li testified that he became involved in HTI in the late 1990's, and that he was Xia's colleague and business partner in HTI for many years.

Alpheus Management Ltd. (Alpheus) performed management services for WWC. It was Shen's testimony that Alpheus was at all times Xia's company. Documentary evidence presented at trial by Xia indicated that, at the time of the sale of WWC in 2017, Alpheus was the sole shareholder of WWC.

In the August 2017 sales agreement memorializing the sale of WWC for approximately $100 million, WWC was identified as the "Target Company," and Alpheus was identified as "Seller." Further, there was a recital in the agreement that Alpheus held "100% of the shareholding in the Target Company." The sales agreement was signed by Xia and by Xia's nephew, Li Zhe, as authorized representatives of Alpheus.

**B.      Testimony of Sophie Shen**

Shen is Xia's older sister. After high school, she became a factory worker. She is a businesswoman who has owned and managed multiple businesses over the years.

Shen testified that she invested money into WWC in the total sum of $1,202,500. She invested in 2003 a total of $1.1 million in five payments. In 2010, Shen invested an additional $102,500. Before Shen made her initial investment in 2003, Xia told her that WWC "was a very promising company," and he anticipated that the return on the investment "would be very high. For example, if you invest in [*sic*] $1, then your return would be $100." She relied on Xia's statements in deciding to invest in WWC.

In July 2003, Xia's company, HTI, also invested $500,000 into WWC.

At the time of her initial investment, Shen understood that as a "family business," she would split all shares of WWC with Xia on a 50-50 basis. She explained that, although her relative initial investment was approximately 69% of the entire investment funds, she felt that a 50% interest for her was fair because Xia was the one who had established WWC. In or about 2005, Shen's equity percentage was reduced to 45%. This reduction, as explained to Shen by Xia at the time, was due to the fact that there were new silent investors in WWC to whom Xia needed to provide equity interests. Shen testified that her WWC equity interest was never subsequently reduced below 45%. Shen never received formal WWC

3

shares.  On one or more occasions at family gatherings, she asked for stock certificates; Xia responded, "[W]e're family.  Do I really need [to] do that?"

Shen performed work for WWC between approximately 2003 and 2015 "without getting benefits."  The main work she performed involved transfers of funds between the various entities, WWC, WWG, and Alpheus.

To Shen's knowledge, besides her investment of $1,202,500 and HTI's investment of $500,000, there were no other equity investors in WWC.

Shen did not learn about the sale of WWC for $100 million until January 2018.  When Shen learned of the sale, she concluded that Xia "had completely fooled [her]," and she promptly consulted an attorney.

Shen filed the first lawsuit against Xia on April 13, 2018.  On April 25, 2018, the court granted Shen's request for a temporary restraining order.  Xia called Shen that day, asking her to withdraw her lawsuit.  After some discussions, Xia said he could give Shen $10 million.  She requested that Xia also provide funds to Shen's older sister (Xiannan) and younger brother (Henry).  They ultimately arrived at $1 million for Xiannan and $2 million for Henry.  Shen asked Xia to draft a note to confirm the arrangement before withdrawing her lawsuit.  Shortly after their conversation, Xia texted Shen a copy of a note he had prepared, which confirmed a $10 million payment only.

After their discussions on April 25, Xia pressured Shen to quickly dismiss the first lawsuit, texting her that from the $10 million promised, there would be a 20% reduction for every day that she did not dismiss the lawsuit.  Shen viewed Xia as "threatening [her] . . . [saying] he was going to give [her] not even a penny" and saying that "he had all the money and that was the point."  She ultimately dismissed the first lawsuit in May 2018.

Shen understood from her discussions with Xia that he would pay her a minimum of $5 million by July 2018, and, at the latest, the entire $10 million would be paid by September 2018.  As of April 2019 (nearly one year after the agreement), Xia had made no

payments. Between July and September 2019, Xia paid Shen approximately $2.4 million, but he made no further payments on the $10 million he promised to pay her.

### C. Testimony of Weiping Xia

In 2003, HTI provided $500,000 to WWC. Xia testified that those funds were repaid in 2014 to HTI with interest for a total of more than $700,000. Xia explained that HTI was one of the contractors of WWG that provided management services; HTI was not an investor. Xia testified further that in July 2011, HTI exited WWC, and, in addition, he resigned from his position as a WWC director.

Xia testified that Shen contributed funds to WWC, but that these funds were loans; she was not an investor and did not hold any WWC stock. Xia testified that, at one point, he viewed Shen as a WWC investor.[3] This viewpoint, he testified, changed in 2011, when Shen told him that she wanted Xia to sign a promissory note with Shen as the lender. Xia testified that Shen told him that she thought the investment was risky and she wanted the money she had provided to WWC treated as loan so that she would be repaid "no matter what happened." Xia testified that he signed an October 11, 2011 non-recourse note as general manager of WWG in the sum of $1,623,789 in which WWG promised to make $20,000 payments to Shen. WWG began making payments to Shen, and Xia testified that she was ultimately paid off in 2014 with a total of $2.16 million.

Xia testified that there were minutes from a July 13, 2011 meeting he attended indicating that WWC had $18.5 million in capital investors, and that Shen held a 6.5% interest in WWC. Xia testified this was accurate as of 2011. Xia further stated that Shen's status as a 6.5% investor "changed to zero" in 2014 when she was paid off.[4]

---

[3] James Li testified that in 2006, Xia told him that by virtue of her investment, Shen held a 51% ownership interest in WWC, while HTI held a 49% interest.

[4] Later in the trial during cross-examination by Shen's attorney, Xia testified that his view was that Shen invested $1.1 million into WWC in 2003 with no expectation she would receive shares in the company. Rather, the funds were simply a loan, and "[s]he only (continued)

5

WWC was sold for approximately $100 million. Xia testified that he had no involvement in the negotiations.[5] He testified that he personally received no proceeds from the sale. The proceeds were all received by Alpheus shareholders.[6] Sales documents were signed by Li Zhe on behalf of Alpheus, as shareholder of the seller. Xia testified that he signed on August 17, 2017, but not as an authorized representative of Alpheus. Rather, Xia explained that he signed only in his capacity as general manager of WWG.

Xia testified that after the first lawsuit was filed by Shen, he contacted relatives, including making a phone call to Shen. He then sent a note to Shen on April 25, 2018; he testified that he signed the note on behalf of Li Zhe, using language that Shen suggested. Shen suggested a payment of $10 million; Xia told her that such payment "was impossible." When he signed and sent the note, Xia did not understand that it was a "legal document" or that it obligated him to pay $10 million.

---

wanted something more conservative, a fixed return; just the interest." But Xia then testified that "[a]t the beginning, all the money [Shen's and HTI's funds provided in 2003] was treated as investment."

[5] James Li, Xia's longtime business associate, contradicted Xia's testimony that he had not been involved in the sale of WWC. Specifically, Li testified that Xia started looking for a WWC buyer in 2011. The first serious talks with a potential buyer occurred after 2014. There were three to four potential buyers with whom Li and Xia met between 2014 and 2017. One of the prospective buyers (according to Xia) had been referred by Shen. They received an offer in 2015 or 2016 for under 500 million RMB (less than $82 million), but Xia told Li the offer was not good enough. Xia told Li that an acceptable price would be 660 million in Chinese currency, RMB ($108 million). Li testified further that in March 2017, Xia introduced Li to the ultimate buyer, Goldwind. Li, at Xia's request, was involved in the sales negotiations with Goldwind. Li was not present when the sales agreement was signed in August 2017, but Xia told Li that the price agreed upon with Goldwind was 680 million RMB. Later, in December 2017, Xia called Li and said that they both needed to meet in China with the Goldwind chairman about post-sale transition issues, so that they could secure the second payment for the sale.

[6] Xia testified he did not know the details concerning distribution of the sales proceeds but acknowledged that his nephew, Li Zhe, was on paper the sole shareholder of Alpheus.

Xia testified that after the note was signed, his role had been to "push [other family members] to meet as soon as possible to get [the] dispute resolved." Shen later told Xia that she had settled with Li Zhe and he had agreed to pay her $2.4 million, with $600,000 paid up front. The funds were to come from Alpheus, not from Xia.

**D.     Documentary Evidence**

There were few documents proffered by Shen at trial confirming her testimony that it was her consistent understanding, based upon communications with Xia, that her investment totaling $1.2 million was for an equity position of not less than 45% of WWC stock. Xia presented a number of documents purporting to refute Shen's claim. A description of some of those documents—as well as the substance of the parties' testimony concerning the documents—follows.

### 1.     *WWC Resolutions (12/21/03)*

Xia testified that he had signed WWC resolutions of December 21, 2003, indicating that the company had received " '[$]1.6 million . . . company capital,' " comprised of $500,000 from HTI and $1.1 million from Shen.[7] The next sentence contained the recital: " 'Each investor guarantees that the investments are in place in the second half year . . .' " On cross-examination, Xia acknowledged that as of 2003, $1.6 million had been invested in WWC, consisting of Shen's $1.1 million and HTI's $500,000 investments. Xia agreed with the accuracy of all statements contained in these resolutions.

### 2.     *WWC Resolutions (01/21/06)*

Xia testified that he attended a WWC meeting in January 2006. He introduced resolutions from this meeting that he signed and were purportedly signed by Shen. They included a recital that WWC had "received $7.57 million of capital."

Shen questioned whether her signature appeared on the 2006 resolutions.

---

[7] This corresponds with Shen's testimony, discussed, *ante*, that in 2003, she invested $1.1 million into WWC by making five payments.

### 3. WWC Resolutions (08/15/08)

Xia attended a WWC meeting on August 15, 2008. He testified that he and Shen signed the resolutions, which included the recital that WWC's capital had increased to $11.31 million.

Shen questioned whether her signature appeared on the 2008 resolutions. She testified that several individuals identified in the resolutions as investors (Shunhua He, Shaojian Zhang, Hao Wang, Runhua Luo) had no affiliation with WWC.

### 4. E-mail to Shareholders (06/22/11)

On June 22, 2011, Xia sent an e-mail to HTI shareholders. In it, Xia described Shen as "the biggest investor so far" of WWC. Xia testified that he did so because he had been misled by Shen, who told him that she was the biggest investor.

### 5. WWC Resolutions (07/13/11)

Xia attended a WWC meeting on July 13, 2011. It was recited in the resolutions from that meeting that there had been $18.5 million in capital contributions to WWC, including Shen's contribution of $1,203,000, "accounting for 6.5 percent of the total capital contribution." Xia testified that these recitals were accurate. The resolutions also recited that "[t]he partner designates without demur Alpheus Management Ltd. . . . to represent the shareholder to wholly take over Western Water Corporation." Xia testified that he resigned as a WWC director at or about the time of the meeting.

Shen testified that, although her purported signature appears on the 2011 resolutions, she did not sign the document and had not seen it before the litigation. Further, prior to 2018, she had never heard of a claim that her equity interest in WWC had been reduced to 6.5%. Shen testified that two individuals identified in the resolutions (Dingtian Ji and Li Wang) had no involvement with WWC.[8] Moreover, Shen never received Xia's July 2011

---

[8] The four individuals listed as investors in the 2008 resolutions whom Shen testified had no involvement with WWC were also identified as investors in the 2011 resolutions. (continued)

resignation as WWC director, and she never knew that Alpheus had been listed on resolutions as the 100% shareholder of WWC.[9]

### 6. Amendments to Promissory Note (10/11/11)

As discussed, *ante*, Xia testified that he signed on behalf of WWG a document designated as amendments to promissory note that was dated October 11, 2011; he testified that he had done so because Shen said she felt her WWC investment was risky and she wanted the money to be repaid as a loan. Xia claimed that by 2014, Shen had been paid $2.16 million under the note for $1,623,789.

Shen testified that the WWG document designated as amendments to promissory note document was a "fake document" created by Xia, and that she never held a nonrecourse promissory note from WWG that could have been amended.

### 7. E-mail, attached spreadsheets, and audit report (10 to 12/13)

Xia provided testimony about a series of October-November 2013 e-mails that he sent to Edith Mak, who was the assistant to Wong (WWC's accountant). There were Excel spreadsheets attached to the e-mail. One of the spreadsheets reflected Shen's total investment of $1.2 million, but also listed her investment as being a 6% interest.[10] Xia testified that he sent the e-mail and attachments to Mak with a copy to Shen. Xia said he obtained the information contained in the spreadsheets from Shen and her friend, Guofeng Luo, who was the financial officer of WWG.

---

Xia testified that he had produced no documents in the litigation concerning any communications with various claimed WWC investors mentioned in the 2008 and 2011 WWC resolutions (i.e., Ji Dingtian, Shunhua He, Hao Wang, Shaojian Zhang).

[9] Consistent with Shen's testimony, James Li, deputy director of WWC since 2002. testified that the WWC resolutions of December 21, 2003, January 21, 2006, August 15, 2008, and July13, 2011, were "fake documents created by Mr. Weiping Xia." One of Li's reasons for that conclusion was that the resolutions identify certain persons as WWC investors that Li knew were not investors in the company.

[10] James Li testified that he had "no idea" why the spreadsheet showed Shen's equity interest at the reduced share of 6%.

9

Xia also testified concerning a document from Wong's accounting firm dated December 12, 2013, purporting to be an audit of WWC's books and records. The document contained a recital that Shen had made an investment in WWC totaling $1,203,000 and that she had a 6% interest in the company. Xia testified that Shen had received the report and told him she had issues with it.

Shen testified that she had not received Xia's 2013 e-mails with attached Excel spreadsheets; she did not see them prior to the litigation. She said that Xia's testimony to the effect that she and Luo had provided Xia with the information contained in the spreadsheets was false. Shen testified that Xia never told her that her WWC interest had been reduced to 6%; she would never have agreed to the reduction. Shen also testified that she did not receive the purported WWC audit report of December 2013 from Wong's accounting firm, and she was not aware of the document prior to the litigation.

## II. PROCEDURAL BACKGROUND

### A. Prior Action

On or about April 13, 2018, Shen filed a lawsuit against Xia in the Santa Clara County Superior Court, case No. 18CV326555 arising out of the sale of WWC (the first lawsuit). In connection with the filing of the first lawsuit, Shen applied for and obtained a temporary restraining order and the issuance of an order to show cause for a hearing on her request for a preliminary injunction scheduled for June 11, 2018. Shen thereafter dismissed the first lawsuit without prejudice.

### B. Current Action: Complaint

Shen filed the complaint in this action on December 30, 2019. Shen alleged 11 causes of action against Xia: (1) breach of fiduciary duty; (2) fraud; (3) concealment; (4) negligent misrepresentation; (5) conversion; (6) fraud; (7) breach of contract; (8) breach of contract; (9) accounting; (10) declaratory relief; and (11) injunctive relief. The sixth and eighth causes of action consisted of claims arising out of Xia's alleged failure to perform on his promises to resolve the dispute that led to Shen's dismissal without prejudice of the first

10

lawsuit. The remaining claims arose out of Shen's contention that she owned at least 45% of WWC and was entitled to a share of the proceeds from the sale of that company. The essential allegations of the complaint are as follows:

In 2003, Xia represented to Shen that WWC would be a good investment opportunity, and Shen invested $1.1 million in WWC from October to December 2003. In March 2010, Shen invested an additional sum of $102,498.75 into WWC. Shen also worked for WWC without compensation for at least 10 years, and she lent WWC approximately $902,000 between 2010 and 2011. Xia represented to Shen that, based upon her contributions, she owned 45% of WWC.

Xia sold WWC sometime in early 2018. Xia failed to disclose the sale to Shen and failed to provide her "with her share of the proceeds." After learning of the sale of WWC, Shen filed the first lawsuit against Xia in April 2018. In response to the lawsuit, Xia promised to pay Shen $10 million. In exchange, Shen dismissed the first lawsuit without prejudice. Xia failed to make the $10 million payment.

C.    Trial

The case proceeded to a 15-day bifurcated jury trial that commenced on October 17, 2022. After phase one of the trial, the jury on November 15, 2022, found by special verdict in favor of Shen and against Xia (a) on the claim for conversion (fifth cause of action), awarding Shen $21 million in damages; and (b) on the claim for false promise (sixth cause of action) relative to Xia's promise to pay Shen $10 million in exchange for her dismissal of the first lawsuit, awarding Shen damages of $7,560,000. The jury found in favor of Xia (a) on the claim for false promise (second cause of action); and (b) for breach of contract claim (eighth cause of action).

After a trial on the second phase (punitive damages as to the sixth cause of action for false promise), the jury awarded punitive damages to Shen in the amount of $1.5 million. After the verdicts, Shen made an election of remedies to recover on the conversion claim in

11

which the jury found in her favor and awarded her $21 million in damages. A judgment in conformity with the verdict was filed on January 6, 2023.

### D. Postjudgment Motions

#### 1. *The Motions*

On January 6, 2017, Xia filed alternative postjudgment motions for terminating sanctions, for a new trial, or to stay enforcement of the judgment. Shen opposed the motions, including separate evidentiary objections with her opposition. Xia filed a reply in support of the motions.

Xia asserted in the postjudgment motions that "Shen and her counsel withheld material evidence" that was the subject of discovery requests and court orders, namely, WeChat instant messaging between herself and WWC accountant Clint Wong occurring in 2018 (the Wong texts). Xia contended that he first became aware of the existence of these documents toward the end of trial on November 9, 2022, when Shen offered testimony on the subject. He claimed further in the motions that after becoming aware of the Wong texts, and sometime after the jury verdict, he was "able to pursue" and he discovered four additional important documents of which he was previously unaware that were relevant to the issues at trial. These four documents were presented in his post-trial motions (hereafter, collectively the Additional Documents).

In support of terminating sanctions, Xia argued that the Wong texts were not produced in response to a notice of Shen's deposition served by Xia's counsel that included a document request, and the texts were again not produced in response to an order compelling Shen's compliance with the production of documents requested in the deposition notice. He contended that Shen's discovery violation was willful, and that terminating sanctions were warranted.

In the alternative to imposing terminating sanctions, Xia argued that, based upon Shen's nondisclosure of the Wong texts and the discovery of the Additional Documents, the

court should grant his motion for new trial under section 657. He raised three statutory grounds, namely, irregularity in the proceedings, surprise, and newly discovered evidence.

Xia argued that, in the event the court denied both the motion for terminating sanctions and the new trial motion, it should exercise its discretion to grant Xia's motion to stay enforcement of the judgment under section 918, subdivision (b).

Lastly, Xia argued that the court should award monetary sanctions based upon the discovery violations, seeking an award based upon the entire legal cost for the trial and post-trial briefing.

### 2. *Order on Postjudgment Motions*

A hearing on Xia's postjudgment motions occurred on February 24, 2023. There was no court reporter for the hearing. After submission of the matter, the trial court filed its order on March 15, 2023.

In its detailed order, the trial court ruled as follows:

(1) The court sustained six of Shen's evidentiary objections to Xia's motions, including objections based on lack of authentication of the four Additional Documents.

(2) The court denied the motion for new trial under section 657, subdivision (4) (hereafter, § 657(4)), concluding that the Wong texts were not newly discovered evidence because Xia "had the opportunity to admit them at the trial, but [he] chose not to."

(3) It denied the motion for new trial under section 657, subdivision (1) (hereafter, § 657(1)), because Shen's failure to produce the Wong texts in response to Xia's discovery requests did not constitute an " '[i]rregularity in the proceedings of the . . . adverse party.' "

(4) It denied the motion for new trial under section 657, subdivision (3) (hereafter, § 657(3)) on the ground of surprise.

(5) Although it concluded that the failure to produce the Wong texts was a discovery violation, the court did not find the violation willful and did not warrant terminating sanctions.

13

(6) The court granted monetary sanctions to address Xia's costs in filing the motion only, ordering a briefing schedule and a hearing on the amount of attorney fees and costs.

(7) It denied the motion for stay.

Xia filed a notice of appeal from the judgment.

### III.  DISCUSSION

### A.  Motion for New Trial

#### 1.  *Appellant's Contentions*

On appeal, Xia contends that his motion for new trial should have been granted on each of the three statutory grounds argued below.[11]

#### 2.  *Applicable Law:  Motions for New Trial*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute.  [Citation.]"  (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.)  Under section 657, there are seven grounds (identified in seven subdivisions) upon which a new trial may be granted.  Three grounds are relevant here.

One ground urged by Xia is "[n]ewly discovered evidence, material for the party making the application, which he [or she] could not, with reasonable diligence, have discovered and produced at the trial."  (§ 657(4).)  The moving party must therefore show (1) that the evidence was newly discovered, (2) the moving party exercised reasonable diligence, and (3) the evidence was material.  (See *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161 (*Sherman*).)  The granting of a new trial motion based on newly discovered evidence is "disfavored."  (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 438 (*Rouillard*).)

---

[11] Although an order denying a motion for new trial is not directly appealable, it may be reviewed on an appeal from the judgment.  (See *Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 435, fn. 11.)

A second basis claimed by Xia in his motion for new trial was "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial." (§ 657(1).) Misconduct of counsel, such as improper argument to the jury, is one form of irregularity in the proceedings that may warrant a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870 (*Decker*).) But the movant must show more than attorney misconduct; he or she must also show that the misconduct was prejudicial. (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149; see also *Garcia v. Rehrig Intern., Inc.* (2002) 99 Cal.App.4th 869, 874 [misconduct " 'as a ground for new trial presents a matter primarily committed to the trial court' "].)

The third ground upon which Xia based his motion for new trial was "[a]ccident or surprise, which ordinary prudence could not have guarded against." (§ 657(3).) Specifically, Xia contended that late disclosure of the Wong messages constituted "surprise" under the statute. " 'The terms "accident" and "surprise," although not strictly synonymous, have, as used in legal practice, substantially the same meaning, as each is used to denote some condition or situation in which a party to a cause is unexpectedly placed to his injury, without any default or negligence of his own [citations], which ordinary prudence could not have guarded against. [Citation.]' [Citations.]" (*Kauffman v. De Mutiis* (1948) 31 Cal.2d 429, 432 (*Kauffman*).) As observed by one court, " '[s]urprise' as a ground for a new trial denotes some condition or a situation in which a party to an action is unexpectedly placed to his detriment." (*Wade v. De Bernardi* (1970) 4 Cal.App.3d 967, 971.)

Perhaps the most fundamental appellate principle is "that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.] 'In the absence of a contrary showing in the record, all presumptions in favor of

15

the trial court's action will be made by the appellate court.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

A ruling on a new trial motion is reviewed for abuse of discretion, and "the exercise of this discretion is given great deference on appeal. [Citations.]" (*Decker*, *supra*, 18 Cal.3d at pp. 871-872.) The denial of a "motion for new trial will not be set aside unless there was an abuse of discretion that resulted in prejudicial error. [Citation.]" (*Jenks v. DLA Piper Rudnick Gray Cary US LLP* (2015) 243 Cal.App.4th 1, 8 (*Jenks*).) Such "abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.) But in applying this deferential standard of review, the appellate court "review[s] the entire record, including the evidence, and independently determine[s] whether any error was prejudicial. [Citation.]" (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1018 (*Crouch*).)

### 3. *Motion for New Trial: Newly Discovered Evidence*

In challenging the trial court's denial of the motion for new trial under section 657(4), Xia asserts that the Wong texts were newly discovered evidence, and they were material to his case. He cites no case authority for the proposition that evidence allegedly withheld that is discovered *before* the trial has concluded may constitute newly discovered evidence. The trial court held that (1) the texts were not newly discovered evidence, and (2) they were, in any event, not material. We conclude the trial court did not err.

As the trial court correctly concluded, the Wong texts were "not newly discovered evidence because [Xia] had the opportunity to admit them at trial, but [he] chose not to." The record is uncontradicted on this point. As discussed immediately below, although Shen repeatedly sought to admit the evidence, Xia repeatedly objected and indicated a desire that it not be admitted.

16

During her cross-examination by Xia's counsel on November 9, 2022, Shen testified that since her filing of the current lawsuit, she had been in communication with Wong through WeChat. At that time, Wong "was representing Weiping Xia to dissuade [her] from filing a lawsuit against" Xia. Shen testified that she did not receive any WWC documents from Wong. Shen stated she had given the Wong texts to her former attorney, Richard Ergo. After the jury was dismissed for the day, Xia's counsel raised an objection based upon the Wong texts having not been previously produced in response to discovery in the case. He argued that there had "been a withholding of documents here" which was "a serious issue." In response to the court's inquiry about the remedy he was seeking, Xia's counsel stated that he would need to consider the matter, but that sanctions or "[a]t a minimum," a jury "instruction on withholding of evidence" were possibilities. The court ordered that Shen's counsel produce the Wong texts that evening.

Before the jury was called the next morning (November 10, 2022), there was a discussion between counsel and the court concerning the Wong texts. Shen's attorney confirmed that the Chinese version of the messages had been produced the prior evening, and he stated that if Xia intended to ask further questions concerning the matter, Shen intended to introduce the Wong texts into evidence. Xia's counsel made clear that he did not wish to introduce the documents as exhibits or address their contents; rather, his proposed further questioning of Shen would be limited to the circumstances of the nondisclosure of the documents. Xia's attorney said he intended to ask questions because it was "[his] opportunity to get more information so that [he could] then make the appropriate sanctions request." Shen's attorney disagreed, arguing that the jury should know the contents of the Wong texts.

The trial court ruled that Xia's attorney could inquire further in his cross-examination of Shen about issues related to whether she was required to produce the Wong texts, but that the content of those messages was outside the scope of evidence that could be presented by either party. Xia's attorney then proceeded to ask Shen further questions about whether and

17

when she provided the Wong texts to any of her attorneys.  Shen testified that she had previously turned over the messages to attorney Ergo in 2020, and she had provided them to her current attorneys the prior evening.  Shen testified further that, before turning the Wong texts over to current counsel, she had, during the trial, showed the messages to her attorney because she believed they impeached Xia's testimony to the effect that Wong did not speak or write Chinese.

The jury was instructed that it could draw adverse evidentiary inferences against a party who willfully suppressed evidence.  (See Judicial Council of Cal., Civ. Jury Instns. (2004) CACI No. 204.)[12]  Thereafter, Xia's counsel highlighted the instruction, requesting that the jury draw the adverse inferences from Shen's claimed suppression that the Wong texts were "very bad for her."  He argued:  "Sophie Shen's communications with Clinton Wong were concealed and not provided to defendant.· You should conclude that it was very bad for her.· That's . . . what you should conclude.· Okay, it was not provided for a reason. And I think you should, you should give every treatment of that as if she knew what it was, it was bad for her case and she [chose] not to turn it over.· Because you know if it was good, she would have turned it over."

We conclude under the circumstances of this case that the Wong texts did not constitute "[n]ewly discovered evidence" under section 657(4).  The statute itself provides that the evidence must be newly discovered and that the moving party "could not, with reasonable diligence, have discovered and produced [the evidence] *at the trial*."  (*Ibid.*, italics added.)  It is thus indicative that section 657(4) applies only to evidence that is newly discovered *after* the trial.  "That a court ruling on a new trial motion pursuant to section 657, subdivision 4 must first determine whether the proffered evidence existed at the time of trial is consistent with the statutory language that the evidence be 'newly discovered.'  *Implicit in*

---

[12] CACI No. 204 provides:  "You may consider whether one party intentionally concealed or destroyed evidence.  If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."

*that term is the concept that the evidence existed, but remained undiscovered at the time of trial.*" (*Aron v. WIB Holdings* (2018) 21 Cal.App.5th 1069, 1079, italics added.)

Xia argues nonetheless (without citation of legal authority) that, because the Wong texts were produced "*after* the trial commenced and *less than 24 hours before the trial ended*" (original italics), they constituted newly discovered evidence under the statute. We disagree. Section 657(4) concerns newly discovered evidence that the moving party could not have reasonably "discovered and produced at the trial." (See *Baron v. Sanger Motor Sales* (1967) 249 Cal.App.2d 846, 858 [new trial based on newly discovered evidence was not established where the evidence "was available at the time of trial"].) The statute does not provide that the moving party may invoke the new trial provision when the evidence is discovered *after the trial commenced but before it is concluded*. We cannot rewrite the statute to accommodate Xia's position here. (See *Dacey v. Taraday* (2011) 196 Cal.App.4th 962, 988.)

Putting aside this statutory interpretation, we note that the trial court found that the Wong texts were not "newly discovered evidence because [Xia] had the opportunity to admit them at the trial, but [he] chose not to." The court correctly observed that, despite Shen repeatedly asking that they be received into evidence, Xia never requested that the messages be admitted, and he had no intention of asking the witness (Shen) about their contents. As the trial court noted further, it was the consistent strategy of Xia's trial counsel that he use the Wong texts, not for their content, but to argue to the jury with the help of a jury instruction that Shen withheld the evidence and did so because "it was very bad for her." In this regard, the trial court concluded that it had "provided [Xia] the precise remedy he requested." From our review of the record, we agree with the trial court's assessment. A reading of the trial transcript suggests that Xia's trial counsel made the tactical decision that it would be preferable to have the jury *assume* that the contents of the Wong texts were very unfavorable to Shen because of their claimed suppression, rather than *actually present* the messages themselves as evidence for the jury to consider.

19

Xia, however, asserts that the trial court abused its discretion in denying the new trial motion by faulting him for not seeking admission of the Wong texts. He argues that the trial court itself stated, after learning about the messages, that they should not be admitted into evidence at such a late stage of the trial. Xia contends that it was "patently unreasonable for the trial court to tell [Xia's] counsel" it was too late to have the documents translated or admitted into evidence, and then criticize him in the new trial order for " 'not want[ing] to have the evidence admitted' and for 'not even ask[ing] to have time to get the texts translated and admitted.' "

In making this argument, Xia ignores the context of what was said over the course of two days by counsel and the court concerning the potential admission of the Wong texts. On November 9, 2022 (when Shen first testified about the messages), it is true that the trial court said, "I think at this point, it's too late to use them as evidence in this trial, particularly if they need to be translated." The court prefaced this by stating to counsel, "I'd [l]ike [to] hear each of your thoughts on this." And the court provided the above-quoted preliminary indication on the possible admission of the Wong texts *immediately after, and in response to* the statement *by Shen's counsel* that he "would love to have those record[s] come into this trial." Prior thereto, Xia's attorney indicated that he would need to think about remedies, but his initial thoughts were that a jury instruction on suppression of evidence and a later motion for sanctions would be appropriate; he did *not* make a request to admit the Wong texts into evidence.

The next morning (November 10), Shen's counsel stated twice that he wished to introduce the Wong texts. Xia's attorney said he "[did not] agree," and indicated his intention was to ask questions of Shen "not about the contents of the document but rather about the circumstances . . . around the suppression of evidence." In reply to the second request by Shen's counsel to introduce the Wong texts, the court stated, "I understand your argument.· Yesterday what we discussed is because of the late nature of it and where we are in the trial and the documents were in Chinese, it was not going to come in as evidence and

it could be a basis of motions for sanctions or possibly a jury instruction and that's all." After a colloquy between counsel in which Shen's counsel suggested the content of the Wong texts should be disclosed and a translator available to translate the messages—which approach Xia's counsel rejected—the court observed, "I think the only issue right now is not the content, it's whether she was required to turn these [texts] over." The court reiterated this point before calling for the jury: "We're absolutely not going into the content anymore [than] we already have because [the texts are] not translated, we don't have time for it." At no time during these proceedings did *Xia's attorney* request that the Wong texts be admitted or translated or that their contents be disclosed. Nor did Xia's attorney request a continuance because of the late disclosure of the documents or ask for a mistrial. And at no time did Xia's attorney push back from the court's statements—that were plainly directed at Shen's attorney, who repeatedly asked that the messages be admitted—that the Wong texts would not be introduced as exhibits and their contents would not be disclosed to the jury. Under these circumstances, the court's statements in the order denying the motion for new trial concerning Xia's having not requested the admission of the Wong texts were not unreasonable and furnished an additional basis for rejecting the claim that the messages were newly discovered evidence.

"[N]ew trials for newly discovered evidence are disfavored. [Citation.]" (*Rouillard*, *supra*, 38 Cal.App.5th at p. 438, citing *In re Estate of Cover* (1922) 188 Cal. 133, 149.) As the trial court properly concluded, the Wong texts disclosed to Xia during the trial did not constitute newly discovered evidence under section 657(4). The court did not abuse its discretion in denying the new trial motion. (See *Jenks*, *supra*, 243 Cal.App.4th at p. 8.)[13]

---

[13] The first requirement for a new trial motion under section 657(4) is that the evidence be newly discovered. (See *Sherman*, *supra*, 67 Cal.App.4th at p. 1161.) Since Xia has failed to show that the trial court abused its discretion in concluding that this element was absent, we need not address the two other requisite elements, i.e., reasonable diligence (continued)

#### 4.    *Motion for New Trial:  Irregularity in the Proceedings*

Xia also based his motion for new trial below upon the position that the withholding by "Shen and her counsel . . . [of] crucial evidence" constituted an "[i]rregularity in the proceedings of the . . . adverse party . . . by which either party was prevented from having a fair trial." (§ 657(1).)  On appeal, Xia's argument—although somewhat cursory and based largely upon incorporating by reference his position concerning newly discovered evidence—is that:  (1) the Wong texts were "crucial evidence . . . required to be produced as part of a court order;" (2) they "contained statements from WWC's accountant that corroborated [Xia's] defense"; (3) Xia "was unable to have those texts admitted as a result of [Shen's] untimely production"; and (4) because the texts were not timely produced, Xia could not depose Wong, secure his testimony at trial, ask Shen questions at deposition and trial about the texts, "and . . . [was] otherwise [unable to] discover additional evidence referenced in those texts."  The trial court rejected Xia's position.

First, we observe that the foundation of Xia's claim that there was an irregularity in the proceedings consists of the assertions that the Wong texts were "crucial evidence" which Xia "was unable to have . . . admitted" as evidence.  As we have discussed, *ante*, the record does not support these claims.  Xia himself chose not to seek admission of the Wong texts, preferring to use their late disclosure to argue to the jury—without showing their content— that Shen did not disclose them because they were "very bad for her."  His suggestions that he requested that the texts be admitted, and the court refused that request, are unfounded.[14]

---

and materiality, required under section 657(4).  (See *ibid.*; see also *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 655 [appellate courts generally "decline to decide questions not necessary to the decision"].)

[14] As noted, *ante*, the trial court's comments indicating that the Wong texts should not be admitted into evidence (nor should their contents be mentioned) were in direct response to the multiple requests by *Shen's counsel* that the documents be admitted.  The court never addressed a request by Xia's counsel to admit the Wong texts because he (continued)

Further, Xia's claims that the Wong texts were "crucial evidence" "that corroborated [his] defense" suggest the question: If the Wong texts were so "crucial" and were favorable to Xia, why did he actively and repeatedly object to their admission into evidence?

Second, it is unclear that a new trial motion for irregularity of the proceedings under section 657(1) is available in this instance, where the claimed "[i]rregularity" is fully known by the moving party *before* the trial has concluded.[15] Section 658 provides that a motion for new trial under section 657(1) must be made on affidavits. As one court has observed: "An 'irregularity in the proceedings' is a catchall phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party 'cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits.' [Citations.]" (*Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1229-1230 (*Montoya*); see also *Gibbons v. Los Angeles Biltmore Hotel Co.* (1963) 217 Cal.App.2d 782, 791-792.) It would appear that here, since the claimed irregularity was known to Xia before the trial concluded, it *was* a matter which he could " 'fully present by exceptions taken during the progress of the trial.' " (*Montoya*, *supra*, at p. 1230.)

Even were we to assume that irregularity of the proceedings in the form of misconduct under section 657(1) was available to Xia, "misconduct can justify a new trial only if it is reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct. [Citations.]" (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122 (*Bell*); see also *id.* at p. 1123 ["the brief mention of insurance," where there were "repeated instructions and admonition," was not prejudicial and did not justify the granting of new trial motion under § 657(1)].)

_____

steadfastly objected to their introduction, instead seeking the remedies of a jury instruction concerning suppression of evidence, argument that Shen's withholding of the documents should be construed unfavorably, and a reserved discovery motion.

   [15] Xia cites no cases in which a party moved for new trial under section 657(1) based upon an irregularity in the proceedings that consisted of claimed discovery violations that became known to the moving party *before* the trial concluded.

This is consistent with article VI, section 13 of the California Constitution:  "No judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  The trial court concluded that Xia had failed to show "that the [Wong] texts were material, or likely to have produced a different result. . . ."

The texts appeared to indicate that Wong, after the current lawsuit was filed in December 2019, was attempting to broker a settlement of the dispute between Xia and Shen, likely at Xia's behest.  Wong expressed the view that Shen had lent WWC money, and he suggested that Xia pay Shen interest on the funds as settlement.  Wong repeatedly referred to the money from Shen as a loan or having been "lent" to Xia.  Wong told Shen she was "never a shareholder or director of WWC."  Shen texted that she disputed Wong's claim that she was a mere lender.  After texts back and forth for three weeks in March 2020, it was clear that there could be no settlement brokered by Wong.

The record does not show a likelihood that if Xia had received possession of the Wong texts prior to trial, a different result would have been achieved.  As noted above, the fact that Xia actively opposed admission of the Wong texts into evidence suggests that Xia himself did not believe the documents were "crucial" or were favorable to his position.  Indeed, it is unclear whether introduction of the Wong texts into evidence would have been advantageous to Xia.  For instance, had the texts been admitted, Shen may have claimed that the assertions by Wong that Shen was a mere lender and never a WWC shareholder: (1) simply parroted what Xia claimed at trial; (2) were inconsistent with what Xia told WWC shareholders as late as June 22, 2011, that Shen was "the biggest [WWC] investor so far"; and (3) contradicted evidence introduced by Xia, through the putative audit report of Wong himself dated December 12, 2013, identifying Shen as having made a total investment into WWC of $1,203,000 for a 6% interest in the company.  Further, Wong stated in the texts that if Shen had in fact been a 30% shareholder with WWC having sold

24

for $100 million, "it would have been reasonable for [her] to claim US30 million." If the Wong texts had been admitted, Shen could have asserted that Wong's failure to deny that Xia received the proceeds from the WWC sale undercut Xia's key contention in the trial that he had received no money from that sale.[16]

Xia argues that it is not merely the contents of the Wong texts and that he purportedly "was unable to have those texts admitted as a result of [Shen's] untimely production" that constituted prejudice. He contends he was also prejudiced because he was not able to depose Shen or Wong about the texts, was unable to procure Wong's testimony, and was unable "to otherwise discover additional evidence referenced in those texts." It does not appear from the substance of the Wong texts that significant facts would have likely been learned from Shen's having been deposed concerning those texts. It is likely that she would have simply reiterated her position that she was entitled to a share of the sales proceeds and that she disagreed with Wong's position that she was never a WWC shareholder. Further, Xia made little or no showing in his motion as it concerned procuring Wong's testimony. Despite the fact that the identity of Wong was very familiar to Xia—and in fact, Wong authored the December 2013 audit report that Xia introduced as a trial exhibit—neither Xia nor his attorney indicated in their respective declarations that, after trial, they made any attempt to follow up with Wong to obtain further information relating to the Wong texts. The contention that Xia would have learned important information from Wong had he been able to speak with him about the texts before trial appears to be speculative. Likewise, Xia's claim that he would have discovered important additional documents had he known about the texts before trial also appears speculative and is unsupported by the record. There were no specific documents identified in the Wong texts that might have prompted Xia to discover them. Moreover, as the trial court observed, Xia failed to explain in his new trial

---

[16] The Wong texts may have also been viewed as contradicting Xia's testimony that Wong did not understand Chinese in written form and did not speak Mandarin.

motion how the disclosure of the Wong texts caused him to discover after trial the four Additional Documents attached to his declaration.

Xia relies on a products liability case, *Sherman*, *supra*, 67 Cal.App.4th 1152, in support of his position that the trial court abused its discretion in denying his motion for new trial. There, the plaintiff husband sued the manufacturer for injuries sustained from his use of a therapeutic bed, and his wife sued for loss of consortium. (*Id.* at pp. 1156-1157.) The plaintiffs propounded discovery seeking documents related to any customer complaints about the specific feature of the bed claimed to be defective, and the defendant provided information of three complaints. (*Id.* at p. 1157.) The defendant's regulatory affairs director in deposition denied knowledge of defects or any incidents similar to the one the plaintiff alleged. (*Ibid.*) At trial, the defense emphasized the minimal product complaints. (*Id.* at pp. 1157-1158.) One week after the conclusion of the trial that resulted in a defense verdict, the plaintiffs' counsel was contacted by a Texas attorney who had sued the defendant; that attorney ultimately supplied the plaintiffs' attorney with 24 incident reports obtained in the Texas litigation after a successful motion to compel. (*Id.* at p. 1159.) The plaintiffs' attorney in *Sherman* then moved for new trial on grounds of newly discovered evidence and irregularity, and requested a default judgment as a discovery sanction, asserting that the defendant had provided false responses to discovery. (*Ibid.*) The trial court denied the motions (*id.* at pp. 1159-1160), and the appellate court reversed, concluding that the plaintiffs were entitled to a new trial on both grounds asserted (*id.* at pp. 1161-1162 & fn. 5).

*Sherman* is distinguishable. Unlike *Sherman*, in this instance, the revelation of the documents (the Wong texts) withheld in discovery occurred *before* the trial (including testimony) had concluded. Xia had the opportunity to address the problem before the case was submitted to the jury—and he did so by objecting to the late disclosure of the

26

documents, requesting a jury instruction, and arguing that the jury should draw inferences adverse to Shen based upon her nondisclosure of the Wong texts.[17]

Acknowledging the trial court's wide discretion in ruling on a motion for new trial and that the exercise of this discretion is given great deference on appeal (see *Decker*, *supra*, 18 Cal.3d at pp. 871-872), we conclude that the trial court did not abuse its discretion in denying Xia's new trial motion based upon irregularity of the proceedings. Even assuming—without so concluding—there was error, we have "review[ed] the entire record, including the evidence, and [we] independently determine . . . [that] any error was [not] prejudicial. [Citation.]" (*Crouch*, *supra*, 39 Cal.App.5th at p. 1018.)

### 5. *Motion for New Trial: Surprise*

Xia also based his motion for new trial on the ground that Shen's late disclosure of the Wong texts constituted "surprise" under section 657(3). Xia contends that he established that, in having to address the late disclosure of the Wong texts, he was required to face a condition that he could not, in the exercise of ordinary prudence, have guarded against. He argues that he "pursued the texts with complete diligence," and the surprise was detrimental to him. The trial court held that "[e]ven if the texts were a surprise that [Xia]

---

**17** Xia argued below in the new trial motion that the withholding of the Wong texts was an irregularity in the proceedings that was compounded by Shen's attorney stating—during a colloquy between counsel in the jury's presence—that the texts would show that Xia was " 'fraudulent.' " Xia's counsel did not object to, or move to strike counsel's statement, nor did he request an admonition from the court. In its order, the trial court, citing *Gimbel v. Laramie* (1960) 181 Cal.App.2d 77, 83, ruled that Xia, by failing to object at the time, had "waived [his] right to claim error from this comment." On appeal, Xia twice mentions the remark by Shen's counsel about Xia being " 'fraudulent.' " It is unclear, however, whether his argument that the withholding of the Wong texts constituted an irregularity in the proceedings is based in part upon the statement of Shen's counsel. In any event, we agree with the trial court that Xia waived (or forfeited) any contention based upon this statement by failing to object to it at the time it was made. (See *People v. Williams* (1997) 16 Cal.4th 153, 220-221 [failure to timely object and seek an admonition with respect to improper argument of counsel resulted in forfeiture of the issue].)

could not have guarded against, . . . the texts did not materially affect his substantial rights and [were] not a basis for granting a new trial."

It is doubtful that a motion for new trial based upon surprise under section 657(3) is legally cognizable in this case. The "surprise" here was Xia's having become aware *while the trial was pending* of the existence of documents that he claimed were withheld from discovery. After learning of the existence of the Wong texts, Xia's counsel did not move for a continuance or a mistrial. Instead, he: asserted an objection; announced an intention to bring a discovery motion; sought and obtained a jury instruction concerning suppression of evidence; and argued to the jury that it should draw inferences adverse to Shen. Xia cites no legal authority here to support his position that a claimed discovery violation learned about during trial may, in the absence of seeking relief at the time, constitute "surprise" supporting a posttrial motion for new trial.

As the California Supreme Court has explained: "[W]here a situation arises which might constitute legal surprise, counsel cannot speculate on a favorable verdict. He [or she] must act at the earliest possible moment for the 'right to a new trial on the ground of surprise is waived if, when the surprise is discovered, it is not made known to the court, and no motion is made for a mistrial or continuance of the cause.' [Citations.]" (*Kauffman*, *supra*, 31 Cal.2d at p. 432.)[18] Thus, in one case, the appellate court found that the trial court had committed reversible error in granting a new trial based upon surprise from the nonappearance of a witness, where the party failed to move for a continuance at the time the issue arose. (See *Garcia v. County of Los Angeles* (1986) 177 Cal.App.3d 633, 637-638, disapproved on other grounds by *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15; see

---

[18] As has been explained by the authors of a practice guide: "A party 'surprised' by developments during trial should seek a *continuance* or move for a mistrial or other relief *during* the trial. Failure to do so may be held to *waive* any right to a new trial on this ground. The party *cannot* gamble on a favorable verdict and then raise this for the first time on a motion for new trial. [Citation.]" (Wegner et al., Cal. Practice Guide: Civ. Trials & Ev. (The Rutter Group 2024), ¶ 18:150, original italics.)

also *Cook v. Mehlberg* (1956) 140 Cal.App.2d 10, 16-17 [denial of motion for new trial based on surprise was proper where plaintiffs learned during trial that their witness had left the state but they made no motion for continuance or motion seeking to take witness's deposition].) We find these authorities persuasive. It does not appear that Xia may invoke section 657(3) to obtain a new trial, where the claimed surprise was known about, and not addressed by a continuance or mistrial motion, during the trial.

Assuming without deciding that Xia established surprise under the statute, he was required to also "show that injury resulted to him [or her] from the cause of such surprise, and this can be done only by showing that he [or she] could establish an entirely different case favorable to himself [or herself] in the event that a new trial be granted." (*Brandt v. Krogh* (1910) 14 Cal.App.39, 60.) Further, to establish relief under any of the seven statutory grounds (including surprise or accident), the specified reason must be one "materially affecting the substantial rights of such party." (§ 657.) As discussed in our consideration of the motion under section 657(1), *ante*, Xia did not establish that any irregularity in the proceedings in the form of misconduct associated with the disclosure of the Wong texts during trial was prejudicial, namely, that "it [was] reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct. [Citations.]" (*Bell*, *supra*, 181 Cal.App.4th at p. 1122.) For the same reasons described in that prior discussion, assuming the claim under section 657(3) was cognizable, Xia did not show that any injury relating to the surprise of the late disclosure of the texts was one that "materially affect[ed his] substantial rights." (§ 657.)

A new trial motion based upon accident or surprise "should be looked on with 'suspicion.' [Citation.] . . . [It] 'is seldom successful' because the moving party to be entitled to a granting of the motion must make a showing of injury, a showing of diligence, and a showing that he [or she] did not unduly delay seeking redress." (*Fletcher v. Pierceall* (1956) 146 Cal.App.2d 859, 866.) Xia's motion for new trial based on surprise relating to the disclosure of the Wong texts *during the trial* was not legally cognizable under

29

section 657(3), and thus the trial court did not abuse its discretion in denying the motion. (See *Jenks*, *supra*, 243 Cal.App.4th at p. 8.) Even if that remedy was available to Xia, we conclude from our review of the entire record that the circumstances relating to that disclosure were not prejudicial. (See *Crouch*, *supra*, 39 Cal.App.5th at p. 1018.)

### 6.     *Motion for New Trial:  The Additional Documents*

As noted, *ante*, Xia declared in his motion for new trial that sometime after the jury verdict, he was "able to pursue" and discovered four Additional Documents. They consisted of a waiver purportedly bearing Henry Xia's signature, and three WWC resolutions (2014, 2015, and 2016). Shen, in her opposition, asserted objections to the Additional Documents on the ground of lack of authentication,[19] and the court sustained those objections.

In his opening brief, Xia does not challenge the trial court's evidentiary rulings concerning the Additional Documents. He has forfeited any appellate challenge to these evidentiary rulings. (See *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41.) Despite this forfeiture, Xia argues in his reply brief that this court should nonetheless consider the claimed significance of the Additional Documents. He argues at length that these documents, had they been discovered sooner, would have had a material effect on the outcome of the case. Xia contends that—notwithstanding the implied acknowledgment that he has forfeited an appellate challenge to the evidentiary rulings— Shen's critique of the Additional Documents in the respondent's brief should amount to a withdrawal of her evidentiary objections. We disagree and do not find Xia's argument persuasive.

Accordingly, since the trial court sustained Shen's evidentiary objections to the Additional Documents and Xia forfeited any appellate challenge to those rulings, we do not

---

[19] Xia submitted a reply to the opposition. but he did not respond to Shen's evidentiary objections.

consider the Additional Documents in reviewing the propriety of the court's denial of the new trial motion.[20]

### B.     Motion for Terminating Sanctions

#### 1.     *Applicable Law:  Discovery Sanctions*

Under the California Discovery Act, the trial court is empowered to issue various forms of sanctions for violating discovery orders, including monetary, evidentiary, issue, and terminating sanctions.  (See *Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 604 (*Lopez*); see § 2023.030, subd. (d) [terminating sanctions available to address misuse of discovery process].)  The two requirements for discovery sanctions are that there has been a failure to comply, and that such failure was willful.   (See *Liberty Mutual Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102 (*Liberty Mutual*).)  Although the trial court is vested with broad discretion in assessing the appropriate discovery sanction, "the courts have long recognized that the terminating sanction is a drastic penalty and should be used sparingly.  [Citation.]" (*Lopez*, *supra*, at p. 604.)

As one court has explained:  "The trial court should consider both the conduct being sanctioned and its effect on the party seeking discovery and, in choosing a sanction, should ' "attempt[ ] to tailor the sanction to the harm caused by the withheld discovery." '

---

[20] We observe that, in any event, the trial court concluded that Xia failed to explain in his motion that there was any link between his learning of the Wong texts and later discovering the four Additional Documents.  The court noted that the texts did not allude to any additional documents of which Xia was not already aware, and Xia, in any event had incentive to search for all documents supporting his position that Shen was not a shareholder.  From our review of Xia's motion papers, we conclude that the trial court appropriately found the absence of a link between Xia's awareness of the Wong texts and his later location of the Additional Documents.  The texts do not reference any specific documents; there is merely an indication in one text that Shen, in anticipating bringing suit against Xia, had asked Wong for "the complete set of documents of Alpheus."  Moreover, Xia presented no explanation in his motion for new trial as to how the disclosure of the Wong texts resulted in his later discovery of the Additional Documents.

[Citation.]  The trial court cannot impose sanctions for misuse of the discovery process as a punishment.  [Citations.]  [¶] The discovery statutes evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate sanction of termination.  'Discovery sanctions "should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery." '  [Citation.]  If a lesser sanction fails to curb misuse, a greater sanction is warranted: continuing misuses of the discovery process warrant incrementally harsher sanctions until the sanction is reached that will cure the abuse.  'A decision to order terminating sanctions should not be made lightly.  But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with discovery rules, the trial court is justified in imposing the ultimate sanction.' " (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992, fn. omitted (*Doppes*).)  In addressing a motion for terminating sanctions, the trial court should review the totality of the circumstances, including "conduct of the party to determine if the actions were willful; the detriment to the propounding party; and the number of formal and informal attempts to obtain the discovery." (*Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1246 (*Lang*).)

In addressing motions for discovery sanctions, the trial court has broad discretion, and its orders will be reversed " 'only for manifest abuse exceeding the bounds of reason.' [Citations.]" (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1293 (*Reedy*).)  "Sanction orders are 'subject to reversal only for arbitrary, capricious or whimsical action.' [Citations.]" (*Liberty Mutual*, *supra*, 163 Cal.App.4th at p. 1102.)  In reviewing an order concerning terminating sanctions, "[w]e view the entire record in the light most favorable to the court's ruling, and draw all reasonable inferences in support of it.  [Citation.]  We also defer to the trial court's credibility determinations.  [Citation.]" (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 765 (*Stephen Slesinger*), disapproved on

32

other grounds by *City of Los Angeles v. PricewaterhouseCoopers, LLP* (2024) 17 Cal.5th 46, 73, fn. 5.)

### 2. *Order Denying Terminating Sanctions*

Xia's motion for terminating sanctions, described briefly, was based upon the following claimed circumstances:  (1) in October 2021, Xia propounded discovery to Shen that included a written document request seeking, inter alia, all communications with Wong and his accounting firm; (2) in January 2022, Xia served a notice of taking deposition of Shen and request for documents that included a request for communications with Wong and his accounting firm; (3) in April 2022, the court granted Xia's motion to compel discovery, including an order that Shen produce documents responsive to the prior requests; (4) despite Shen's subsequent production of documents and her representations that all responsive documents had been produced, she did not produce the Wong texts; (5) despite his having spoken with Wong in 2019 and 2020, Xia was unaware that Shen had been communicating with Wong; and (6) Xia first became aware that Shen and Wong had communicated by WeChat when Shen testified at trial on November 9, 2022.  Xia argued that Shen and her counsel had "withheld material evidence from the defense in violation of an order compelling discovery."  Xia asserted that had he known about the Wong texts, he would have asked questions about the subject in Shen's deposition, and he would have attempted to secure Wong's testimony at deposition or trial.  Xia argued further that the conduct of Shen and her counsel was willful and detrimental to Xia.

Shen responded that there was no basis for imposing discovery sanctions because "[t]he nonproduction of the Wong texts was the inadvertent result of some special circumstances, not intentional conduct."  These "special circumstances" were that:  (1) Shen had provided the Wong texts to her former attorney, Ergo, in the spring of 2020 when there was no outstanding discovery; (2) through oversight, they were not part of the electronic files delivered by Ergo to Shen's successor counsel; (3) in mid-2022, while Shen was in China for an extended time period "dealing with [a] serious family emergency," at her

attorney's request, she searched for documents not provided before to Ergo and sent them to her current attorneys, at the time, not being aware that Ergo had not provided the Wong texts to them; and (4) when the issue concerning disclosure of the Wong texts came up at trial, Shen's current attorneys conducted a file review and determined that the texts had not been transferred to them by Ergo as part of the case files.

The trial court denied Xia's motion for terminating sanctions. Quoting *Creed-21 v. City of Wildomar* (2017) 18 Cal.App.5th 690, 702, the court noted that " '[a] decision to order terminating sanctions should not be made lightly.' " After considering the totality of the circumstances, the trial court determined that while "there *was* a discovery violation. . . [because] Shen was required to produce the WeChat texts as part of the [court's] Order," it did not find that the violation was willful. (Italics added.) The trial court, however, did grant an award of monetary sanctions commensurate with the fees and costs associated with Xia's filing of the motion.[21]

Having viewed the entire record in a light most favorable to the court's ruling and deferring to its credibility determinations (see *Stephen Slesinger, supra*, 155 Cal.App.4th at p. 765), we conclude there was no error in the court's denial of the motion for terminating sanctions. While there was evidence that may have supported a finding that the discovery violation was willful, there was ample evidence supporting the contrary conclusion. Further, while we acknowledge Xia's contention that the nonproduction of the Wong texts was seriously detrimental to Xia as the propounding party (see *Lang, supra*, 77 Cal.App.4th at p. 1246), the trial court disagreed with that assessment. It addressed at length in its order the issue of prejudice as it concerned the motion for new trial. The court also addressed the degree of detriment resulting from the nondisclosure of the Wong texts in its order denying terminating sanctions. It concluded that the type of sanction to be "imposed should be based largely on the detriment to the party seeking discovery. . . . In this case, as previously

---

[21] As there is no challenge to the trial court's monetary sanctions order by Xia in this appeal—nor was there a cross-appeal by Shen—we do not address that order.

34

discussed, the effect on the party seeking discovery was not substantial and did not deprive [Xia] of a fair trial or materially affect his rights. That the texts were not significant is best demonstrated by the fact that Defendant never asked for more time to have them translated or admitted. Defendant specifically and repeatedly opposed admission of the texts when Plaintiff requested their admission. Defendant made the tactical choice to have the jury consider Plaintiff's failure to turn them over rather than have it consider the content of the texts. Furthermore, . . . the Court does not believe that the texts [led] to the discovery of new documents, or would have changed whether or not Defendant was able to or wanted to call Mr. Wong as a witness."

In its denial of Xia's motion for terminating sanctions, the trial court "consider[ed] the totality of the circumstances," including whether the actions of Shen and her counsel were willful and the extent of detriment to Xia. The court's denial of the motion did not constitute " 'manifest abuse exceeding the bounds of reason' " requiring reversal of the order. (*Reedy*, *supra*, 148 Cal.App.4th at p. 1293.) The trial court did not err. (Cf. *Doppes*, *supra*, 174 CA4th at p. 971 [observing that reviewing court's reversal of the trial court for abuse of discretion in denying terminating sanctions request for misuse of discovery process was, in that instance, an "extraordinary, yet justified, determination"].)

### C.    Denial of Motion In Limine

Lastly, Xia argues that the court erred in denying his motion in limine to exclude all evidence concerning a Bank of America account ending in 269 (the 269 Account). He contends that any probative value attached to the evidence was outweighed by its prejudicial effect.

#### 1.    *Procedural Background*

##### a.    **Motion in Limine**

Before commencement of the trial, Xia filed a motion in limine in which he sought, inter alia, an order excluding evidence of financial transactions between Xia and Li Zhe. Xia's motion was argued at trial on at least two occasions. Xia argued that evidence of the

35

financial transactions was "financial discovery of [Xia,] . . . [was] highly prejudicial," and there wasn't a "sufficient nexus [between the financial evidence] to the sale proceeds." The court denied the motion in limine, concluding that the evidence of deposits and withdrawals from the 269 Account was not unduly prejudicial, and that the evidence had probative value that was not outweighed by any potential prejudice. The court also indicated that, if proposed, it would entertain a limiting instruction concerning admission of evidence concerning the 269 Account.

During argument, it was revealed that besides the 269 Account, there was a second bank account in Li Zhe's name (with no power of attorney held by Xia), and that Shen intended to introduce evidence relating to that second account. In later proceedings, there was further discussion about the second account. There was also further discussion about the relevance of evidence concerning the 269 Account. The court ruled that it would not allow admission of evidence concerning the second account. It confirmed its prior ruling that evidence of the 269 Account would be received.

### b.      Evidence Presented at Trial

Li Zhe (Shen's and Xia's nephew) was listed as the accountholder of the 269 Account. Xia received a power of attorney in February 2015 for that account. The address of Xia's home in Morgan Hill was listed on the checks and statements for the 269 Account.

The sale of WWC occurred in August 2017; Alpheus was identified in the sales agreement as the seller. Shen presented evidence that after the WWC sale, millions of dollars were transferred from Alpheus to the 269 Account that Xia controlled through a power of attorney.[22] Shen introduced a lengthy summary of transactions for the

---

[22] These included the following separate transfers to the 269 Account between September 2018 and March 2020, totaling over $3 million: $450,000 (9/12/18); $250,000 (11/29/18); $200,000 (1/3/19); $199,975 (1/22/19); $99,975 (4/15/19); $899,975 (5/2/19); $99,975 (6/4/19); $31,121 (6/4/19); $99,888 (6/6/19); $100,000 (10/18/19); $400,000 (10/22/19); $197,980 (3/10/20).

269 Account. Xia was asked about some of these transfers, and he admitted they had been made to the 269 Account. At or about the time of these deposits, there were large (in excess of $2 million) corresponding transfers from the 269 Account to an Ameritrade stock account in Xia's name.[23] Shen contended that Xia controlled this Ameritrade account. Xia testified, however, that, although the account was in his name, the funds were used by Li Zhe for his own stock trading. Shen also presented evidence that Xia used funds from the 269 Account for his personal liabilities, including landscaping services, and a June 2019 payoff of $786,000 for the mortgage on his Morgan Hill home.

### 2.   *Discussion of Claim of Error*

Generally, as is true in this instance, motions in limine are brought " 'to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party.' " (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669.) "The trial court enjoys 'broad authority' over the admission and exclusion of evidence. [Citation.]" (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 295.) We review a ruling on a motion in limine to exclude evidence for abuse of discretion. (See *Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1403 (*Dillingham-Ray Wilson*).) In reviewing a ruling permitting or excluding evidence, and specifically the trial court's application of Evidence Code section 352, we are mindful that "[i]t is for the trial

---

[23] The transfers of funds from the 269 Account into the Ameritrade account occurring between September 2018 and March 2020 consisted of funds in the total amount of $2,196,900: $250,000 (9/13/18); $150,000 (9/14/18); $47,000 (12/11-26/18 [6 transactions]); $170,000 (1/4/19); $110,000 (1/23/19); $30,000 (1/25/19); $20,000 (2/11/19); $15,000 (3/20/19 [2 transactions]); $4,000 (3/26/19); $10,000 (4/8/19); $52,000 (4/18/19); $264,000 (5/3/19 to 6/3/19 [18 transactions]); $6,000 (6/4/19 [2 transactions]); $50,000 (6/6/19); $35,000 (7/12/19); $100,000 (7/24/19); $100,000 (8/20/19); $8,200 (9/25-10/3/19 [3 transactions]); $10,100 (10/11/19 [2 transactions]); $70,000 (10/18/19); $80,000 (10/21/19); $220,000 (10/22-23/19 [2 transactions]); $46,000 (12/6-10/19 [2 transactions]); $50,000 (1/13/20); $70,000 (1/21-28/20 [3 transactions]); $14,000 (2/4/20 [4 transactions]); $20,100 (2/19-28/20 [10 transactions]); and $195,500 (3/5-19/20 [8 transactions]). (See fn. 22, *ante*.)

court, in its discretion, to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. The appellate court may not interfere with the trial court's determination to admit the evidence, unless the trial court's determination was beyond the bounds of reason and resulted in a manifest miscarriage of justice." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 596 (*Rufo*).)

Xia's claim of error has two essential components. First, he asserts that evidence concerning the 269 Account was not relevant because: (a) Xia did not own the account; (b) his only relationship to it was through his holding of a power of attorney; (c) the account had many transactions that preceded the WWC sale; and (d) there was no showing that money deposited by Alpheus into the account after the date of the sale constituted proceeds from that sale. Second, Xia contends—apparently invoking Evidence Code section 352—that "even if the account had some relevance, its prejudice outweigh[ed] any probative value."[24]

Evidence concerning the transfers to and from the 269 Account were plainly relevant. Shen presented evidence that in the two years after the WWC sale for approximately $100 million, Alpheus transferred over $3 million to the 269 Account. That account, while in Li Zhe's name, was controlled by Xia through a power of attorney, and the bank statements were sent to his home. Coinciding with these deposits, there were disbursements from the 269 Account to Xia's Ameritrade stock account and to his mortgage lender of more than $2.5 million.[25] The jury could draw reasonable inferences from this evidence that: (1) Xia was, in fact, in control of Alpheus before and after the WWC sale; (2) he, through

---

[24] Xia did not cite Evidence Code section 352 in his opening brief. In his argument, Xia does not identify the correct statutory standard. Under Evidence Code section 352, the trial "court *in its discretion* may exclude evidence if its probative value is *substantially outweighed* by the probability that its admission will . . . create *substantial danger* of *undue* prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*, italics added.)

[25] This $2.5 million figure does not include other transfers claimed to be for Xia's benefit, such as payments on Xia's Chase credit card account between October 2018 and November 2019 totaling over $202,000.

Alpheus, transferred to the 269 Account over $3 million of the proceeds the company received from the sale; and (3) at or around the time of these transfers, Xia, using his power of attorney, transferred funds from the 269 Account for his own benefit. Additionally, the fact that there were transactions that preceded the WWC sale does not preclude a trier of fact from concluding that the some or all of the post-sale deposits by Alpheus into the 269 Account were proceeds from the WWC sale.

Moreover, although the central question was whether the funds transferred by Shen to WWC were for purchase of shares or were loans, related issues raised by Xia's testimony were whether he played any role in the sale of WWC and whether he received any sales proceeds. Xia testified he played no role and received no benefit from the WWC sale. Shen contested that position, and she presented evidence through James Li's testimony to the contrary. (See fn. 5, ante.) Shen also asserted that Xia at all times was directly involved in the WWC business, he was active in Alpheus (the company that managed WWC and was WWC's sole shareholder), and that various relatives he appointed to nominally run the company over the years were figureheads.[26] If a trier of fact were to conclude that deposits to the 269 Account were sales proceeds and that concurrent disbursements in the millions of dollars went to Xia, Shen's evidence concerning the 269 Account would have been a severe attack upon Xia's credibility. There is therefore no merit to Xia's claim on appeal that the "probative value [of the 269 Account evidence] was low and based entirely on speculation. . . ."

---

[26] James Li testified concerning a July 2011 e-mail Xia sent to HTI shareholders, indicating that " 'WWG is still under our control no matter what changed.' " Li understood that even though Xia had removed his name and HTI's name from WWG, HTI was still controlling WWG as before. Also in 2011, Xia told Li that Alpheus and his sister, Xiannan, were collectively the "nominal holder" or nominal shareholder of WWC, meaning that HTI, headed by Xia, was still in control of WWG. And Li testified that although Shen at one time had access to the account, from 2011 forward, Xia was the only person authorized to make disbursements from the Hong Kong bank account of WWC.

Xia makes the conclusory argument that he "was prejudiced" as a result of the admission of the 269 Account evidence. (See *DiRaffael v. California Army National Guard* (2019) 35 Cal.App.5th 692, 718 ["conclusory assertions of prejudice are insufficient"].) His position appears to be that the jury heard evidence about "large sums of money" that he contends had nothing to do with the WWC sale. Xia appears to confuse the distinction between the introduction of relevant evidence that is harmful to the other party with evidence that is of marginal probity that is highly prejudicial. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . ' . . . The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Xia has failed to make a showing—or even articulate the proper legal principles of Evidence Code section 352—that his motion in limine should have been granted because the probative value of the 269 Account evidence was "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice." (*Ibid.*) Mindful as we are the trial court is vested with the discretion "to determine whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice. . . [and that we] may not interfere with the trial court's determination to admit the evidence, unless [it] was beyond the bounds of reason and resulted in a manifest miscarriage of justice" (*Rufo*, *supra*, 86 Cal.App.4th at p. 596), we conclude the trial court did not abuse its discretion by admitting the 269 Account evidence. (See *Dillingham-Ray Wilson*, *supra*, 182 Cal.App.4th at p. 1403.)

## IV.    DISPOSITION

The judgment is affirmed.  The order denying the motion for new trial, motion for terminating sanctions, and motion for stay is affirmed.  Statutory costs are awarded to respondent.

_____

WILSON, J.

WE CONCUR:

_____

GROVER, ACTING P.J.

_____

BROMBERG, J.

***Shen v. Xia***
**H050937**